The **CITY OF SHERMAN, Texas, and The Sherman City Council,** Appellants,

v.

**James WAYNE, Appellee.**

**No. 05–06–00420–CV.**

Court of Appeals of Texas, Dallas.

Aug. 18, 2008.

Doreen E. McGookey, Office of the City Attorney, Sherman, TX, E. Allen Taylor, Jr., Fredrick Quast, Taylor, Olson, Adkins, Salla & Elam, L.L.P., Fort Worth, TX, for Appellants.

Luke Motley IV, Sanders, O'Hanlon & Motley, P.L.L.C., Sherman, TX, Bill W. Russell, P.C., Victoria, TX, for Appellee.

Before Justices MOSELEY, O'NEILL, and FRANCIS.

## OPINION

Opinion By Justice MOSELEY.

In this regulatory takings case, we determine whether James Wayne's claims are ripe for adjudication and, if so, whether the evidence supports the trial court's judgment that application of the City of

Sherman's residential zoning ordinance to Wayne's property deprived him of all economically viable use of the property. Wayne sued the City of Sherman and the Sherman City Council[1] (the "City") to recover adequate compensation for an alleged regulatory taking of his property by application of the City's residential zoning ordinance. Following a jury trial, the trial court determined that application of the residential zoning ordinance to Wayne's property deprived him of all economically viable use of the property and amounted to a regulatory taking. The jury found the property had a market value of zero with the residential zoning applied and a market value of $250,000 without the residential zoning. The trial court rendered judgment in favor of Wayne for actual damages of $250,000, plus prejudgment interest.

In five issues, the City appeals claiming Wayne's regulatory takings claim is not ripe for judicial review, application of the residential zoning ordinance does not constitute a regulatory taking under the holding of *Lucas v. South Carolina Coastal Council*,[2] the evidence is legally and factually insufficient to support the jury's finding that Wayne's property had a market value of zero with the residential zoning ordinance in place, and the trial court's judgment should be modified to vest title to Wayne's property in the City upon satisfaction of the judgment.

## I. BACKGROUND

In 1958, the Texas National Guard operated an armory and vehicle storage building on 9.3 acres of property in Sherman, Texas (the "property"). The buildings and parking lot are located on approximately 3 acres and the remaining property is undeveloped land. In 1964, the City passed an R–1 (one and two-family residential district) zoning ordinance on the property, prohibiting all commercial and industrial uses. The Guard continued to operate the armory and vehicle storage building until 1999, when the property was decommissioned and the Guard began looking for buyers. At that time, the buildings were in good shape, but contained some levels of asbestos and lead paint that would create an environmental hazard if the buildings were renovated or demolished. Lead was also contained in the area of an old firing range. The property is steeply graded, forty to sixty percent of the undeveloped property lies within a flood plain, and portions of the property are thickly wooded.

The property is located on the southeastern edge of the City. A creek borders the property on the west side, separating it from a residential subdivision. South Gribble Avenue borders the property on the east side and the municipal airport is located further east across Gribble Avenue. To the north, is a City park and baseball field. To the south is vacant land. The area surrounding the property has had very little residential growth since the 1960s.

In December 2001, Wayne purchased the property from the Guard through a bid-process for $126,307.92. Other bids submitted on the property ranged from $6500 to $88,800. Wayne testified he purchased the property to use the well-built Guard buildings for commercial use. He believed the property was "grandfathered-in" and not subject to the residential zoning ordinance because the Guard buildings

---

1. The city council was named as a party in the pleadings below and as an appellant on appeal. The city council was sued in its official capacity and the trial court's judgment did not award any relief against the council.

2. 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

were constructed prior to the enactment of the ordinance, they continued to operate for thirty-five years after the ordinance had passed, and the property appeared highly unsuitable for uses other than industrial or commercial. In June 2002, Wayne negotiated a lease of the property to a truck driving school.

During negotiations for the lease, Wayne became aware the City intended to enforce the residential zoning ordinance. Wayne initially sought to change the zoning to light industrial. After negotiating with and accepting the recommended modifications of the City's Planning and Zoning Board, Wayne applied to change the zoning designation from R–1 to C–2 (commercial general purpose), and also for a special use permit to allow the property to be used as a truck driving school. The Sherman City Council (the "Council") denied both the application for a zoning change and the special use permit. Wayne then gave notice of a claim against the City and later filed this suit.

At trial, both parties presented conflicting evidence and appraisals on the value of the property with and without the residential zoning enforced. Two experts and Wayne testified that the property was not economically feasible to use for residential purposes and the market value of the property with the residential zoning ordinance in effect was zero. The experts testified that it would cost from $16,000 to $23,000 to develop each lot on the property, but the most the developed lots could sell for was $7500. The City presented evidence to show the property did have value with the ordinance in place, referring to the other bids made on the property, the property's tax appraisal value, and one expert's comment that the raw land could sell for $1000 an acre.

The jury found the market value of the property with the residential zoning en-forced was zero and the market value without the zoning enforced was $250,000. Wayne moved for judgment on the verdict. The trial court rendered judgment finding Wayne's regulatory taking claim was ripe for judicial determination and the application of the residential zoning ordinance to Wayne's property resulted in a compensable regulatory taking because it deprived Wayne of all economically viable use of his property. The judgment awarded Wayne damages of $250,000 plus prejudgment interest. The City's motion for new trial and motion to modify the judgment were overruled by operation of law.

## II. RIPENESS

In its first issue, the City claims Wayne's regulatory takings claims are not ripe for judicial review because the City did not reach a final decision regarding Wayne's property.

### A. Standard of Review and Applicable Law

Ripeness is an element of subject matter jurisdiction and, as such, is subject to de novo review. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928–29 (Tex. 1998). An essential prerequisite to the ripeness of a regulatory takings claim is a final decision regarding the application of the regulation at issue. *Id.* at 929; *See also Hallco Tex., Inc. v. McMullen County*, 221 S.W.3d 50, 59 (Tex.2006). "A court cannot determine whether a regulation has gone 'too far' unless is knows how far the regulation goes." *Mayhew*, at 929 (quoting *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986)). A final decision usually requires both a rejected development plan and the denial of a variance from the controlling regulation; however, futile variance requests or re-applications are not required. *Id.* Property owners are

not required to seek permits for developments that the "property owner does not deem economically viable." *Id.* at 932; *see also Palazzolo v. Rhode Island,* 533 U.S. 606, 623, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) ("Ripeness doctrine does not require a landowner to submit applications for their own sake."). Moreover, the term "variance" is "not definitive or talismanic"; it encompasses "other types of permits or actions [that] are available and could provide similar relief." *Mayhew,* 964 S.W.2d at 930. "While a landowner must give a land-use authority an opportunity to exercise its discretion, once it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened." *Palazzolo,* 533 U.S. at 620, 121 S.Ct. 2448.

## B. Discussion

 The City contends Wayne's regulatory takings claims are not ripe because the City did not reach a final decision regarding Wayne's property. Specifically, the City asserts Wayne's single application for a zoning change from R–1 to C–2, and request for a specific use permit for a truck driving school were insufficient to ripen the claim and represented too great of a "leap" from how the property was zoned to be used to how Wayne requested to use it. The City argues there were many uses in between the existing zoning and the requested zoning so that a final decision on what uses the City would or would not allow could not be reached.

After negotiating the lease, Wayne contacted the City and was informed the City intended to enforce the residential zoning ordinance. He then submitted a zoning change application and request for a specific use permit to the City's Planning and Zoning Board (the "Board"). Wayne initially requested changing the zoning from R–1 to M–1 (light manufacturing district); however, the Board suggested, and Wayne agreed, to change the zoning request from M–1 to C–2 (general commercial district). The Board was also concerned with traffic and noise problems created by the truck driving school. Accordingly, Wayne agreed to keep the tractor-trailers off of the property, parked on U.S. 75, and the students of the school would be shuttled by van to get to the tractor-trailers for instruction. In addition, only one idle tractor would be kept on the property for technical and instructional purposes.

After making these changes to address the Board's concerns, the Board recommended approval of the zoning change application and the specific-use permit to the Council. After a public hearing, the Council, however, voted unanimously to both reject the zoning change application and deny the specific-use permit. The minutes of the meeting contain comments by three of the seven Council members expressing concerns about the proximity of the property to a park and residential area and stating the property should remain residential. The minutes show no Council member spoke in favor of Wayne's proposal.

The City asserts there is a wide range of possible uses for Wayne's property other than the existing zoning that the City has not decided against. For example, with a specific use permit, the property could be used for a church, a doctor or dentist office without retail, an orphanage or children's home, a medical or dental clinic, a nursing home, offices for services without retail, or a nursery or day care center. With a change to retail business zoning (C–1), the property could be used for a catering business, medical clinic, mini-warehouse, storage facility, or veterinarian office. With a change to commercial office zoning (C–O),

any type of office would be possible, and a variety of other uses are possible in C–1 or C–O zoning with a specific use permit. Wayne counters that these other uses are not feasible because of the property's location in a remote area of the City with little traffic and no growth, and the costs of renovating the existing structure for use as an office, retail, or other purposes.

While we must know how far a regulation goes before we can determine whether it has gone "too far," we are mindful that "government can use [the] ripeness requirement to whipsaw a landowner." *Hallco*, 221 S.W.3d at 63 (Hecht, J., dissenting). "Ripening a regulatory-takings claim thus becomes a costly game of 'Mother, May I', in which the landowner is allowed to take only small steps forwards and backwards until exhausted." *Id.* The City makes just such an argument that Wayne was required to submit multiple applications for zoning changes or specific use permits until he found one the City would approve or he became exhausted. However, the record indicates the uses of the property the City would permit—one or two-family residential—"are known to a reasonable degree of certainty." *Palazzolo*, 533 U.S. at 620, 121 S.Ct. 2448.

We conclude Wayne's rejected re-zoning application, including his concessions to the Board, and the denial of his request for a specific use permit were sufficient to allow the City to reach a final decision regarding the use of his property. *See Mayhew*, 964 S.W.2d at 929–31 (modified application per negotiations with regulators can satisfy variance requirement). Wayne was not required to re-apply numerous times to the City to change the zoning because the City's first refusal was clear and such additional efforts would have been futile. *See id.* at 929. Further, given the nature of the property and its location, Wayne did not deem any of the other possible uses cited by the City economically viable. *See id.* at 932. We overrule the City's first issue.

## III. REGULATORY TAKING

In its second issue, the City claims enforcement of the residential zoning ordinance against Wayne's property was not a regulatory taking under the *Lucas* test because it did not deprive Wayne of all economically viable use of the property. Wayne contends the trial court's judgment is supported by any of the three theories of regulatory takings (discussed below), but the *Lucas* claim is most compelling on this record.

### A. Standard of Review and Applicable Law

The Texas Constitution provides that no "person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made." TEX. CONST. art. I, § 17; *Sheffield Dev. Co., Inc. v. City of Glenn Heights*, 140 S.W.3d 660, 669 (Tex.2004). Inverse condemnation occurs when property is taken for public use without proper condemnation proceedings and the property owner attempts to recover compensation for that taking. *City of Dallas v. Blanton*, 200 S.W.3d 266, 271 (Tex.App.-Dallas 2006, no pet.). To state a cause of action for inverse condemnation under the Texas Constitution, a plaintiff must allege: (1) an intentional governmental act; (2) that resulted in his property being taken, damaged, or destroyed; (3) for public use. *Id.* Although the Texas constitution's adequate compensation provision is worded differently than the just compensation clause of the Fifth Amendment to the United States Constitution, the Texas Supreme Court has described them as comparable and generally looks to federal cases for guidance in takings cases. *See*

*Hallco*, 221 S.W.3d at 56; *Sheffield*, 140 S.W.3d at 669.

 Determining whether a property regulation is a taking requires the consideration of a number of factual issues; however, the ultimate question of whether a zoning ordinance constitutes a compensable taking is a question of law, not a question of fact. *Mayhew*, 964 S.W.2d at 932. We consider all of the surrounding circumstances in resolving this legal question. *Id.* While we depend on the trial court to resolve disputed facts regarding the extent of the governmental intrusion and the diminution in the property's value, the ultimate determination of whether the facts are sufficient to constitute a taking is a question of law. *Id.* at 933, 936–37.

 Takings are classified as either physical or regulatory. *Mayhew*, 964 S.W.2d at 933. A physical taking occurs when the government authorizes an unwarranted physical occupation of an individual's property. *Id.* Physical possession is a categorical taking for which compensation is required. *See Hallco*, 221 S.W.3d at 56; *Sheffield*, 140 S.W.3d at 669–70. Wayne does not claim the City has physically taken his property; rather, he alleges the enforcement of the residential zoning ordinance constitutes a regulatory taking.

 A property regulation falling short of a physical invasion may also constitute a regulatory taking. *See Sheffield*, 140 S.W.3d at 670; *Mayhew*, 964 S.W.2d at 933–35. At least three theories of regulatory takings have been discussed by the United States Supreme Court and the Texas Supreme Court, although the first has been called into question.

First, a property regulation constitutes a regulatory taking if it does not substantially advance a legitimate state interest. *Mayhew*, 964 S.W.2d at 933–34. The City points out that this formulation has been

overruled by the United States Supreme Court in *Lingle v. Chevron USA, Inc.*, 544 U.S. 528, 540–41, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005). The Texas Supreme Court has not yet addressed whether the substantial advancement test remains valid for Texas constitutional law purposes in light of *Lingle*. *See Hallco*, 221 S.W.3d at 61 n. 6; *Rowlett/2000, Ltd. v. City of Rowlett*, 231 S.W.3d 587, 595 (Tex.Civ.App.-Dallas 2007, no pet.).

 Second, a property regulation that denies a property owner of all economically beneficial or productive use of the property "makes the regulation categorically a taking." *Hallco*, 221 S.W.3d at 56 (quoting *Sheffield*, 140 S.W.3d at 671); *see Mayhew*, 964 S.W.2d at 935 (citing *Lucas*, 505 U.S. at 1015–19 and n. 8). This is generally referred to as a *Lucas* claim. *See Lucas*, 505 U.S. at 1015–19, 112 S.Ct. 2886. Determining whether all economically viable use of a property has been denied entails a relatively simple analysis of whether value remains in the property after the governmental action. *Mayhew*, 964 S.W.2d at 935. Depriving a land owner of all economically beneficial use of property is "tantamount to depriving him of the land itself." *Sheffield*, 140 S.W.3d at 671. However,

this is "limited to 'the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted'" and "the landowner is left with a token interest."

*Id.* (quoting *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (quoting *Lucas*, 505 U.S. at 1017–19, 112 S.Ct. 2886) and *Palazzolo*, 533 U.S. at 631, 121 S.Ct. 2448).

 Third, if a regulation does not destroy all economically viable use, it may still constitute a regulatory taking if, under

an "essentially ad hoc, factual inquir[y]," the government action unreasonably interferes with a landowner's use and enjoyment of the property (known as a *Penn Central* claim). *Hallco,* 221 S.W.3d at 56; *Sheffield,* 140 S.W.3d at 671–72 (quoting *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)). Determining whether the government has unreasonably interfered with a landowner's right to use and enjoy property requires a consideration of factors including: (1) the economic impact of the regulation; (2) the extent to which the regulation interferes with the owner's distinct investment-backed expectations; and (3) the character of the governmental action. *Sheffield,* 140 S.W.3d at 672; *Mayhew,* 964 S.W.2d at 935–36.

## B. Discussion

The City challenges the trial court's judgment that applying the residential zoning ordinance to Wayne's property deprived him of all economically viable use of the property. The City argues Wayne's property has "some value" and that a regulatory taking under *Lucas* is virtually impossible. In *Lucas,* the Supreme Court refused to reconsider the unchallenged finding by the trial court that the construction regulation rendered Lucas's lots "valueless." *Lucas,* 505 U.S. at 1020 n. 9, 112 S.Ct. 2886. The Court concluded that when a property owner is "called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." *Id.* at 1019, 112 S.Ct. 2886.

This Court has said that a *Lucas* regulatory taking is limited to the "extraordinary circumstance" when no economically viable use is permitted. *See Rowlett/2000,* 231

S.W.3d at 592 (quoting *Tahoe–Sierra,* 535 U.S. at 330, 122 S.Ct. 1465). Extraordinary, however, does not mean impossible. In *Mayhew,* and *Rowlett/2000,* the evidence indicated the properties retained significant values even with the regulations in place. *See Mayhew,* 964 S.W.2d at 927, 937 (fact finding property had market value of $2.4 million after denial of planned development request); *Rowlett/2000,* 231 S.W.3d at 594 (conflicting evidence of value in undeveloped state ranging from $2000 per acre to $5000 per acre supported jury's "no" answer to liability questions). In *Rowlett/2000* we also said a reasonable jury could conclude that land valued at least $2000 per acre was more than a token value. *Rowlett/2000,* 231 S.W.3d at 594.

Here, under the unique facts of this case, the jury and the trial court concluded Wayne's property with the residential zoning in place was valueless and application of residential zoning deprived him of all economically viable use of his property. There is evidence in the record that, *excluding* the cost of demolishing the existing structures, it would cost at least $16,000 to 19,000 per lot to develop the property for residential purposes. Even the City's expert witness estimated some of the costs to develop 35 residential lots on the property, including demolition cost estimates, some public utilities, and drainage improvements, at $12,000 per lot.[3] There is an inventory of residential lots in the area selling for $2500 to $4500 per lot. There was evidence that the most a residential lot in that area could sell for was $6000 to $7500, but there was no demand for residential lots in that area. Wayne testified the property with residential zoning had a negative value because of hold-

---

**3.** This estimate did not include other costs such as electric utilities, cable television, tele-

phone, street lights, or the developer's soft costs.

ing costs like maintenance, taxes, and insurance.

 The City dismisses Wayne's testimony as merely evidence of lost profits. *See Taub v. City of Deer Park,* 882 S.W.2d 824, 825–26 (Tex.1994) ("The takings clause ... does not charge the government with guaranteeing the profitability of every piece of property subject to its authority."). While it is true that government is not an insurer of the profitable use of property, it is incorrect to say that profit is not a consideration in determining the value of property. We agree with the supreme court "that lost profits are clearly one relevant factor to consider in assessing the value of property and the severity of the economic impact of rezoning on a landowner." *Sheffield,* 140 S.W.3d at 677.

The City points to cross-examination testimony of Dixie Edwards in response to the question "[Y]ou're not telling us today that the raw land is not worth anything; are you?" that "[W]ell, you know, you might get $1,000 an acre for it." [4] The land is not, however, raw land. There is a substantial structure on the property possibly containing lead and asbestos materials. Other witnesses testified that estimates to demolish the structure and abate the environmental issues ranged from $150,000 up to $250,000.[5] Edwards also testified there was no market in the area

for residential lots and Wayne's property with residential zoning enforced had a value of zero.

The City contends the jury's finding on the market value of the property is not binding and that the property has some value with the residential zoning ordinance in effect. The City cites other language from *Mayhew* to the effect that a reviewing court owes no deference to a trial court's finding that there was no economically viable use of the property, as that involves a question of law. *Mayhew,* 964 S.W.2d at 937. The City further argues that the property has some value because it can be sold for some amount of money and because the other bids made at the time Wayne purchased the property are indicative of the property's fair market value.

 The City is correct that we owe no deference to the trial court's finding that the property had no economically viable use with the residential zoning ordinance applied. *See id.* at 937. However, we do look to the underlying factual determinations regarding the extent of the governmental intrusion and the diminution in the property's value. *Id.* Unlike *Mayhew* and *Rowlett/2000,* the underlying factual determination in this case is that the property's value with the regulation in force is

---

4. In context, the testimony was:
 Q Now, you say that the property has no market value; correct? Is that you testimony that it's not worth anything?
 A We're just talking about the land.
 Q If that's what you're saying?
 A Well, what are you asking? I mean—
 Q Is it your testimony that the land is worth absolutely nothing? It has absolutely no fair market value?
 A Well, I bet to me—probably the most—I don't know what they'd do with it, if they can't use it for commercial. Or if they can't—I would think it's probably not very good.

 Q So you're not telling us today that the raw land is not worth anything; are you?
 A Well, you know, you might get a thousand dollars an acre for it.
 Q So you might get something for the land?
 A You might get something if somebody could use it, I guess.

5. Based on his discussions with several contractors, the City's engineering expert estimated the cost of demolition of the two buildings, apparently without removing the concrete slab or considering the concrete drilled piers in the armory, at $52,500.

zero. Thus, the factual determinations of the extent of the governmental intrusion—restriction of this property to residential use—and the diminution in the property's value—to zero—have been made by the jury based on evidence we conclude herein as both legally and factually sufficient. The trial court's conclusion that Wayne's property had no economically viable use with the ordinance applied is supported by the jury's finding that the market value of the property after the ordinance was reduced to zero. Deference to this type of factual finding of the trial court is supported by *Mayhew*. *See id.* at 933, 937.

The record shows, as will be discussed in greater detail later in this opinion, that the property could not be sold without incurring a loss. Moreover, the offers made on the property by other bidders are inconclusive because they were made before the City rejected Wayne's non-residential use of the property and there is no evidence to show that these bidders were unlike Wayne, who only bid on the property under the firm belief that the zoning ordinance would not be enforced in an area so unsuited for it.

The City asserts two appraisal reports admitted at trial show the property had significant value with residential zoning. However, a review of the appraisals show they did not assume the property could be used solely for residential purposes.

The W.F. Smith Company appraised the property "as is" for the Texas Military Facilities Commission in July of 2000.

This appraisal stated the property was zoned "Public," which the report states would permit any use consistent with state, county, or other city rules, so long as it was some form of public use.[6] This appraisal used the sales comparison approach based on comparable sales of commercial buildings[7] in the area to value the property as of June 15, 2000 at $250,000.

The second appraisal report was a restricted appraisal prepared by a General Land Office staff appraiser in 1999. Although the report recognizes the current zoning is one- or two-family residential, it concludes there is insufficient demand for the land in the area to justify tearing down the armory building for redevelopment. The armory building could be used by the city or county as a community center. The vacant land could be used as residential, but would require modest building restrictions. The report values the property at $65,000 as of July 8, 1999.[8]

■ At best, the City merely points to evidence in the record that the property may have some value with residential zoning. Of course, an appraisal is simply an opinion as to value based on several assumptions; and, as the supreme court has said, all opinion is at best something of a speculation and the question of market value is peculiarly one for the fact finding body. *Texas Pipe Line Co. v. Hunt*, 149 Tex. 33, 41, 228 S.W.2d 151, 156 (1950). Although whether a taking has occurred is ultimately a question of law, Wayne's burden was not—as the City seems to sug-

---

6. The report states the structure "appears to be perfect for conversion to a city, county or state recreational facility or training facility of some kind. That appears to be the highest and best use of the property, in its 'As Improved' state."

7. The report describes the sales comparison approach as the best indicator of value in the case "as the sales were older buildings being

used for industrial or commercial purposes there [sic] were inferior to the subject structure."

8. The report states the appraiser performed a limited appraisal process, as defined by the Uniform Standards of Professional Appraisal Practice. The restricted report included only the appraiser's conclusions.

gest—to prove beyond all possible doubt that the value of the property with the residential zoning was zero. As discussed herein, other evidence supports the conclusion that this particular property in its location has no market value zoned as residential property. The jury and the trial court believed the evidence supporting the no value conclusion.

■■■ The City also argues in its reply brief that it never changed the zoning after Wayne bought the property and therefore he owns exactly what he bought—an old armory building on 9.3 acres of land zoned for residential use. Of course, the simple fact that Wayne purchased the property years after the zoning ordinance was enacted does not bar his taking claim. *See Palazzolo*, 533 U.S. at 626–29, 121 S.Ct. 2448 ("It would be illogical, and unfair, to bar a regulatory takings claim because of the post-enactment transfer of ownership where the steps necessary to make the claim ripe were not taken, or could not have been taken, by a previous owner."). The Supreme Court rejected the categorical rule that a person who acquires title to the property after the regulation at issue is enacted cannot suffer a taking. *Id.* Thus, we find no significance in this argument.

We overrule the City's second issue.

### IV. LEGAL AND FACTUAL SUFFICIENCY

■■■ In its third and fourth issues, the City claims the evidence was legally and factually insufficient to support the trial court's finding that the property's market value was reduced to zero with the residential zoning ordinance in effect.

### A. Standard of Review and Applicable Law

■■■ To evaluate the legal sufficiency of the evidence to support a finding, we must "determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994); *see also St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519 (Tex.2002) (plurality op.). We view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 807 (Tex.2005).

■■■ To evaluate the factual sufficiency of the evidence to support a finding, we consider all the evidence and will set aside the verdict only if the evidence supporting the jury finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Dyson v. Olin Corp.,* 692 S.W.2d 456, 457 (Tex.1985). This Court, however, is not a fact finder, and we may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of the evidence. *See Clancy v. Zale Corp.,* 705 S.W.2d 820, 826 (Tex.App.-Dallas 1986, writ ref'd n.r.e.).

■■■ Market value is "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying." *City of Harlingen v. Estate of Sharboneau,* 48 S.W.3d 177, 182 (Tex.2001) (citing *State v. Carpenter,* 126 Tex. 604, 89 S.W.2d 979, 979 (1936)). The three traditional approaches to determining market value are the comparable sales method, the cost method, and the income method. *City of Harlingen,* 48 S.W.3d at 182 (citing *Religious of Sacred Heart v. City of Hous-*

*ton,* 836 S.W.2d 606, 615–17 & n. 14 (Tex. 1992)). In certain circumstances, a fourth method, the subdivision development method, may also be used. *City of Harlingen,* 48 S.W.3d at 186.

## B. Discussion

The City contends that there is no evidence to support the jury's finding of zero market value because Wayne's expert witnesses employed the subdivision development method [9] to calculate the market value, which cannot be employed when a comparable sales approach is possible.

We reject the City's argument because this issue goes to the legal and factual sufficiency of the evidence presented, not whether market value derived from a particular method should have been admitted, as was the case in *City of Harlingen.* *See,* 48 S.W.3d at 180. Whether or not the jury was convinced of the market value derived from a particular method goes to credibility and weight given to the experts' testimony, of which the fact finder is the sole judge. *See Leyva v. Pacheco,* 163 Tex. 638, 641, 358 S.W.2d 547, 549 (1962). Further, unlike the landowner in *City of Harlingen,* Wayne did not submit an appraisal expert who used a hypothetical subdivision development method. Wayne presented evidence regarding the market for residential land in the area and the suitability of the armory property for development as residential property.

The City further contends that evidence in the record shows that the property did have value so that the jury's finding of no value is against the overwhelming weight of the evidence.

The record contains evidence from three witnesses, two experts and the property owner, Wayne, regarding the value of the property. Dixie Edwards, a real estate broker with 26 years' experience in residential and commercial real estate, testified that the property was not economically feasible to use for residential purposes and the market value of the property with the residential zoning ordinance in effect was zero. She stated the most Wayne could sell an individual lot for was $7500, but that it would cost between $16,000 and $19,000 to develop the lot to sell, resulting in a substantial loss for every lot. Additionally, Edwards testified she spoke with three real estate developers who told her no one would want to build new homes on the property because there is no demand in the area nor is the area attractive to developers. Edwards further testified that the location along with the expenses to renovate the existing buildings make it infeasible to put a church, dental office, doctor's office, or retail store on the property.

Steve Roth, an expert with 33 years' experience in general construction and residential and commercial development, testified that he inspected the property and found that it was not suitable to use for residential purposes. He stated the National Guard buildings could not be used for residential purposes and would have to be demolished. This would be very costly due to the substantial construction of the military grade buildings and the possibility of asbestos and lead paint in the buildings; the property would require environmental remediation if the buildings were extensively renovated or demolished.[10] He also

9. "This method values an undeveloped tract by calculating what a developer could expect to realize from sales of individual lots, taking into account the costs of development and discounting future revenues to present value." *City of Harlingen,* 48 S.W.3d at 180.

10. There was evidence that use of the buildings for commercial purposes as proposed by

testified the property itself is unsuited for residential use; it is heavily brushed, which is costly to remove, located in large part in a flood plain, and slopes severely. In addition to these costs, the property would have to be equipped with water, electric, and other utilities, a sewage system, and other infrastructure, resulting in a minimum cost per lot of $23,817.[11] Roth concluded that if Wayne developed those lots, he could only sell them at a loss.

Wayne also testified [12] that the property was worthless, stating it had a negative market value since he was losing money every year from maintenance, taxes, insurance, and deterioration. Wayne estimated his total costs at $15,000 to $20,000 per year without any money coming in from the property.

The City counters with evidence of the property's market value based on what potential buyers willingly bid for it with the residential zoning ordinance in place. These bids ranged from $6500 to $88,800, with Wayne himself bidding and ultimately paying $126,307.92 for the property. The City also argues that Dixie Edwards testified that the raw land would sell for $1000 per acre for a total of $10,000 for the whole property. Lastly, the City points out that the Grayson Appraisal District states the property's appraised value was $23,875 in 2002.

 Wayne responds by first pointing out that there is no evidence in the record to show that the other bidders were willing to purchase the property if they believed

the residential zoning regulation would actually be enforced in an area so unsuited for it. Wayne himself purchased the property under the mistaken belief that the zoning would be changed to accommodate commercial use, and there is no evidence to show the other bidders did not possess the same mistaken belief. Second, Wayne refutes the City's argument about Edwards's statement that the raw land could sell for $1000 per acre by pointing out that the property is not raw land, but rather land burdened with buildings and structures. These would have to be removed for much more than $10,000 before the land could be sold raw. Finally, the tax appraisal is no criterion of market value in condemnation proceedings because it rarely reflects the true market value. *See Dallas County Bail Bond Bd. v. Black*, 833 S.W.2d 247, 249 (Tex.App.-Dallas 1992, no writ); *Houston Lighting & Power Co. v. Fisher*, 559 S.W.2d 682, 686–87 (Tex.Civ. App.-Houston [14th Dist.] 1977, writ ref'd n.r.e.).

Crediting all favorable evidence that reasonable jurors could believe and disregarding all contrary evidence except that which they could not ignore, we conclude the evidence is legally sufficient to support the jury's finding that the market value of the property with residential zoning applied was zero. *See Moriel*, 879 S.W.2d at 25; *see also Wolff*, 94 S.W.3d at 519; *see also Wilson*, 168 S.W.3d at 807. After reviewing all the evidence, we cannot say the evidence is so weak that the jury's

Wayne would not require environmental remediation. If remodeling disturbed any asbestos or lead paint, the area would have to be encapsulated.

11. As noted above, the City's expert estimated development costs of at least $12,000 per lot not including electric, cable, and telephone utilities and street lights.

12. In its reply brief, the City argues that Wayne's testimony about the market value of the property was not proper; however, it is well-settled in Texas that a land owner may testify about the value of his or her property. *See Redman Homes v. Ivy*, 920 S.W.2d 664, 669 (Tex.1996); *State v. Cent. Expressway Sign Assocs.*, 238 S.W.3d 800, 807 n. 3 (Tex. App.-Dallas 2007, pet. filed).

market value finding is clearly wrong and unjust; thus the evidence is factually sufficient to support the jury's finding that the market value of the property with residential zoning applied was zero. *See Cain,* 709 S.W.2d at 176; *Dyson,* 692 S.W.2d at 457.

We overrule the City's third and fourth issues.

## V. MODIFICATION OF JUDGMENT TO VEST TITLE IN THE CITY

 The City timely filed a motion to modify the trial court's judgment to vest title to the property in the City on satisfaction of the judgment. This motion was overruled by operation of law. In its fifth issue, the City argues the trial court erred in overruling the motion and requests that if the trial court's judgment is affirmed as a *Lucas* claim, the judgment be modified to vest title to the property in the City upon satisfaction of the judgment. *See City of East Dallas v. Barksdale,* 83 Tex. 117, 122, 18 S.W. 329, 331 (1892); *Tarrant County Water Control & Improv. Dist. v. Fowler,* 175 S.W.2d 694, 698 (Tex.Civ.App.-Dallas 1943), *writ ref'd w.o.m.,* 142 Tex. 375, 179 S.W.2d 250 (1944). Wayne argues the City did not plead for this relief before trial and that he has incurred additional expenses in connection with the property after the date of the taking and the trial court could have crafted some equitable remedy for these expenses had the City made its request earlier.

Wayne's claims were based on a total taking of his property under *Lucas.* He did not contend his property had been damaged or partially taken; he asserted the entire property was rendered valueless as a result of the City's action. Depriving a land owner of all economically beneficial use of property is "tantamount to depriving him of the land itself." *Sheffield,* 140 S.W.3d at 671. A necessary result of a

taking under these circumstances—based on Wayne's allegations—would be that on payment of· adequate compensation the City would acquire ownership of the property. *See Barksdale,* 18 S.W. at 331; *see also Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency,* 561 F.2d 1327, 1332 (9th Cir.1977) (affirming requirement of quitclaim deed to agency on payment of inverse condemnation judgment); *but see City of Houston v. Kolb,* 982 S.W.2d 949, 956–57 (Tex.App.-Houston [14th Dist.] 1999, pet. denied) (declining to award easement to city where denial of development plat was to reduce cost of any future acquisition of right-of-way). Although the City did not plead for this relief in the event the trial court found there had been a taking, the natural result of Wayne's suit would require title to pass to the City on payment of adequate compensation. We conclude the City was not required to plead for this relief and timely requested modification when the judgment did not include it.

 In his brief to this Court, Wayne offers to transfer his title if the City pays full compensation plus reimbursement of his additional maintenance expenses since the date of the taking. We reject Wayne's argument for any additional expenses because he incurred these expenses regardless of whether the judgment awarded title to the property to the City, and, assuming without deciding such expenses were recoverable in an inverse condemnation proceeding, he did not request or obtain jury findings as to them. *See City of Harlingen,* 48 S.W.3d at 182 (normal measure of damages in condemnation case is land's market value); *Tarrant Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 557–58 (Tex. 2004) (diminution in value one measure of damages in inverse condemnation).

We sustain the City's fifth issue.

## VI. CONCLUSION

We have overruled the City's issues challenging the trial court's judgment finding a regulatory taking and jury's findings of damages. However, we have sustained the City's issue requesting the trial court's judgment be modified to vest title to the property in the City on satisfaction of the judgment. Accordingly, we modify the trial court's judgment to provide that on satisfaction of the judgment, all right, title, and interest of Wayne in the property shall vest in the City. As modified, we affirm the trial court's judgment.