**Affirmed in Part, Reversed and Rendered in Part, and Opinion filed January 13, 2015.**



In the

# Fourteenth Court of Appeals

### NO. 14-14-00222-CV

## THE CITY OF GALVESTON, TEXAS, Appellant

## V.

## JOE MURPHY, YORAM BEN-AMRAM, AND GALTEX DEVELOPMENT, LLC, Appellees

**On Appeal from the 10th District Court
Galveston County, Texas
Trial Court Cause No. 12-CV-0907**

## O P I N I O N

Appellees Joe Murphy, Yoram Ben-Amram, and Galtex Development, LLC[1] sued the City of Galveston, claiming that the City unconstitutionally took their property without just compensation through inverse condemnation. The City filed a plea to the jurisdiction, which the trial court denied. The City timely filed this

---

[1] We refer to the appellees collectively as the "Property Owners."

interlocutory appeal, asserting that the trial court lacked subject-matter jurisdiction because the Property Owners' claims are not ripe for review. We affirm in part, and reverse and render in part a judgment of dismissal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At the time of the claims, Ben-Amram d/b/a Galtex owned the property at issue, subject to a mortgage held by Murphy. The property—consisting of two buildings built in 1910 and approximately 1955-1965, respectively—is located in Galveston, Texas, on Sealy Street, in the East End Historical District. Although the Historical District is zoned for single-family dwellings, the property was categorized and operated as "multiple-family dwellings," comprising a total of 14 rental units.

On September 13, 2008, Hurricane Ike struck Galveston Island and flooded the first floors of the property. Repairs began in January 2009. On January 30, 2009, the City advised Galtex that the property was "unfit" for human habitation and had been "condemned." The tenants evacuated. Ben-Amram and Galtex pulled permits and began renovations. In May 2009, the City "red tagged" one of the buildings for lack of compliance with the Historical Code and requested mold remediation and moisture reports. Renovations continued. The condemnation as to the lower floors was lifted in November 2009 but was reinstated in December 2009 after an inspection. In January 2010, City inspectors indicated that the condemnation would be lifted if various code items were completed and a letter from a certified engineer attesting to the property's safety was provided.

Over the next few months, Ben-Amram met and communicated with City inspectors regarding these and additional requested items. In May 2010, City officials for the first time informed the Property Owners that, because the property had been unoccupied for over six months, it had lost its "grandfathered" non-

2

conforming status and would require a Specific Use Permit (SUP)[2] to be occupied as multi-family dwellings.

In December 2010, Ben-Amram submitted the SUP application to the City. He also submitted copies of the application to the Landmark and Planning Commissions for review and recommendation. In January 2011, Ben-Amram's and Galtex's engineer recommended certain brick work. The additional brick work commenced. Later in January 2011, both the Landmark and Planning Commissions recommended denial of the SUP application. City staff recommended approval, subject to meeting specified conditions, including meeting all compliance requirements necessary to lift the condemnation, and providing more parking spaces or requesting a variance.

City Council heard the Property Owners' request for a SUP on February 10, 2011, and denied the request. Murphy foreclosed on the property in October 2011. In April 2012, the Property Owners filed suit against the City, alleging that the SUP denial, as well as the City's "purported" invocation of the six-month vacancy used to then require the SUP, constituted a regulatory taking under both the Texas and federal constitutions.

The City filed a motion to dismiss for lack of subject-matter jurisdiction. The City argued that the Property Owners' claims were not ripe because there was no final or definitive decision regarding use of the property as multi-family dwellings. The City attached evidence consisting of Ben-Amram's deposition transcript and exhibits, and the relevant excerpt from the February 2011 City Council public hearing. The Property Owners filed a response.

---

[2] The parties also refer to the SUP as a "special use permit."

On February 18, 2014, the trial court held an evidentiary hearing. The Property Owners presented three live witnesses: City Councilmember Beeton, Ben-Amram, and Murphy. The Property Owners also read excerpts from the depositions of two City officials and offered exhibits. On February 28, 2014, the trial court signed an order denying the City's motion to dismiss. The City timely filed this interlocutory appeal. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(8) (West 2011).

## II. ANALYSIS

### A. Standard of review

We review the trial court's ruling on a plea to the jurisdiction under a de novo standard. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004).[3] Where, as here, the plea to the jurisdiction challenges the existence of jurisdictional facts, the trial court considers relevant evidence submitted by the parties. *Id.* at 227. If the evidence creates a fact question regarding jurisdiction, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the factfinder. *Id.* at 227–28. But if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228.

"[T]his standard generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c). . . . By requiring the [governmental entity] to meet the summary judgment standard of proof in cases like this one, we protect the plaintiffs from having to put on their case simply to establish jurisdiction." *Id.* (internal quotation marks and citation omitted); *accord Dallas Cnty. v. Wadley*,

---

[3] While the usual procedural vehicle to challenge the sufficiency of the pleader's jurisdictional allegations or the existence of jurisdictional facts is a plea to the jurisdiction, the City's motion to dismiss here functioned as a plea to the jurisdiction. *See Drexel Corp. v. Edgewood Dev., Ltd.*, 417 S.W.3d 672, 674 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

4

168 S.W.3d 373, 377 (Tex. App.—Dallas 2005, pet. denied).

Under this standard, we credit as true all evidence favoring the nonmovant and draw all reasonable inferences and resolve any doubts in the nonmovant's favor. *Miranda*, 133 S.W.3d at 228. The movant must assert the absence of subject-matter jurisdiction and present conclusive proof that the trial court lacks subject-matter jurisdiction. *Id.* Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). If the movant discharges this burden, the nonmovant then must present evidence sufficient to raise a material issue of fact regarding jurisdiction, or the plea will be sustained. *See Miranda*, 133 S.W.3d at 228.

## B. Inverse condemnation

Article I, section 17, of the Texas Constitution, the "takings clause," mandates that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person." Tex. Const. art. I, § 17. Similarly, the Just Compensation Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V; *Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 135 S.W.3d 620, 645–46 (Tex. 2004) (violation of Just Compensation Clause may be brought under 42 U.S.C. § 1983).

When a governmental entity intentionally takes private property for public use without adequately compensating the landowner, "the owner may recover damages for inverse condemnation." *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 554 (Tex. 2004). To assert inverse condemnation, a claimant must plead: (1) the governmental unit intentionally performed an act (2) that resulted in the taking, damaging, or destruction of the claimant's property (3) for public use. *See Gen. Servs. Comm'n v. Little–Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex.

2001); *Kirby Lake Dev. v. Clear Lake City Water*, 321 S.W.3d 1, 5 (Tex. App.—Houston [14th Dist.] 2008), *aff'd*, 320 S.W.3d 829 (Tex. 2010). Takings can be classified as either physical or regulatory. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998). While all property is held subject to the valid exercise of the police power, a regulatory action may, under some circumstances, constitute a taking requiring compensation. *See Hallco Tex., Inc. v. McMullen Cnty.*, 221 S.W.3d 50, 56 (Tex. 2006).

Here, the Property Owners allege a regulatory taking that denied all economically beneficial or productive use of the property or, in the alternative, unreasonably interfered with the use and enjoyment of the property. *See id.*

## C. Ripeness

Ripeness is an element of subject-matter jurisdiction and, as such, is subject to de novo review. *Mayhew*, 964 S.W.2d at 928–29. "A controversy is 'ripe' for the courts when it has 'legally matured.'" *City of Paris v. Abbott*, 360 S.W.3d 567, 578 (Tex. App.—Texarkana 2011, pet. denied). A regulatory takings claim ordinarily is not ripe until there has been a "final and authoritative determination" by the governmental entity applying the regulations at issue to the property. *Mayhew*, 964 S.W.2d at 929; *see Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985). This is because "a court cannot determine whether a taking or other constitutional violation has occurred until the court can compare the uses prohibited by the regulation to any permissible uses that may be made of the affected property." *Mayhew*, 964 S.W.2d at 929; *see Hallco*, 221 S.W.3d at 70 ("A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes.'" (quoting *MacDonald, Sommer & Frates v. Cnty. of Yolo*, 477 U.S. 340, 348 (1986)).

6

A final decision usually requires both a rejected development plan and the denial of a variance from the controlling regulations. *Mayhew*, 964 S.W.2d at 929. Failure to reapply or seek a variance ordinarily is fatal to the ripeness of claims. *Id.* at 931. When a general zoning or land-use restriction is subject to discretionary application or variance, "the impact on a particular property may not be ripe until a variance is finally denied." *Hallco*, 221 S.W.3d at 60. Such variance requirement is applied flexibly to serve its purpose of giving the governmental entity an opportunity to grant alternate forms of relief or make policy decisions that might abate the alleged taking. *Mayhew*, 964 S.W.2d at 930. However, futile reapplications or variance requests are not required. *Id.* at 929. Property owners are not required to seek permits for developments that the "property owner does not deem economically viable." *Id.* at 932.

The City contends that the Property Owners' claims are not ripe because they never obtained a final decision regarding their use of the property as an apartment complex. According to the City, its denial of the SUP primarily was based on code safety and structural concerns with the property, including the lack of the engineer's letter. In other words, the decision was not final as City Council encouraged Ben-Amram to bring the property within compliance, submit the engineer's letter, and reapply; however, he did not reapply. The City also asserts that with regard to the parking concern, Ben-Amram had the option of seeking a variance on the parking requirement from the Zoning Board of Adjustment and did not.

The Property Owners respond that their case is ripe. In particular, the Property Owners contend the record contradicts the City's position that the SUP application was denied due to safety concerns. The Property Owners also argue that the City Council hearing was a "sham" designed to wear them down into

7

acquiescing to demands for density reduction, and that "[a]ny efforts by Ben[-] Amram to make further applications of any kind would be futile."[4]

### 1. Evidence pertaining to ripeness of denial of SUP application

While a landowner must give the land-use authority an opportunity to exercise its discretion, a takings claim likely will have ripened once it becomes clear that the governmental entity lacks the discretion to permit the requested usage, or the permissible uses of the property are known to a "reasonable degree of certainty." *See Palazzolo v. Rhode Island*, 533 U.S. 606, 620 (2001). Here, City Council had the discretion to grant the Property Owners' SUP application, despite the commissions' recommendations. Therefore, the key question is whether the City's denial of the SUP constituted a final decision such that we know to a reasonable degree of certainty the extent of permitted usage of the property. *See MacDonald*, 477 U.S. at 348–49, 351. We conclude that it does not.

We begin our discussion with *Mayhew*, with which the Property Owners align and which the City attempts to distinguish. The Mayhews complained that the town's refusal to approve their planned development constituted a taking. 964 S.W.2d. at 926. After reiterating that the concept of ripeness requiring final decisions is usually signified by rejected development plans and variance denials, the *Mayhew* court highlighted the exception that "futile variance requests or re-applications are not required," and ruled that any further actions would have been

---

[4] In addition, the Property Owners essentially argue that the City conjured up the illegal SUP requirement in order to force them to reduce the number of rental units. They contend that the City improperly relied on the zoning standards—Ordinance Section 29-111(a)(4)—to revoke the property's non-conforming status and require the SUP. Instead, according to the Property Owners, a different section of the code—Ordinance Section 29-111(c)—governs, which permits reconstruction on non-conforming structures after a natural disaster. The Property Owners also argue that any additional parking requirement conflicted with Ordinance Section 29-111(d). We need not reach the construction of these ordinances in order to review the trial court's ruling on the plea. *See* Tex. R. App. P. 47.1.

8

futile, even though the Mayhews did not file another application and failed to apply for a variance. *Id.* at 929, 931. The ruling, however, was limited to the "unique circumstances" of that case. *Id.* at 932.

In that case, the Mayhews owned several hundred acres of land which they hoped to develop, but were confronted by an ordinance prohibiting planned developments with densities in excess of one dwelling unit per acre. *Id.* at 925. The Mayhews met with the town, which amended the ordinance to allow development in excess of the limit, with council approval. *Id.* at 926. After spending half a million dollars for studies and the preparation of evaluative reports, the Mayhews submitted their planned development proposal to the town. *Id.* If approved, the Mayhews planned to sell the property to a third party for development. *Id.* However, the third party would only develop the property if it could build a minimum of 3,600 housing units. *Id.* Thus, the Mayhews sought approval to build 3,650 to 5,025 units. *Id.* After four months of consideration, the town's planning and zoning commission recommended denial of the application. *Id.* The town council next appointed a negotiating committee, which met with the Mayhews and agreed to a compromise development of 3,600 units, the minimum number of units needed for the third party to purchase the property for development purposes. *Id.* At a subsequent meeting of the town council, the council was informed that approval for less than 3,600 units would be considered an outright denial. *Id.* Despite the prior compromise with the negotiating committee, the town council voted to deny the development. *Id.* A meeting to reconsider the vote was later cancelled by the town. *Id.* Instead of reapplying or applying for a variance, the Mayhews filed suit. *Id.* at 931.

The *Mayhew* Court observed that "[n]ormally, their failure to reapply or seek a variance would be fatal to the ripeness of their claims." *Id.* (citing

9

*MacDonald*, 477 U.S. at 351; *Hamilton Bank*, 473 U.S. at 188–91). However, because the "evidence in this case establishe[d] the extent to which the Mayhews worked with the [t]own in attempting to have their development approved"— spending $500,000, engaging in negotiations with the town for over a year, compromising with a negotiating committee after an initial negative response from the town's planning and zoning committee, suffering a rejection of their amended development plan application, and cancellation of reconsideration of the town council's vote—the Texas Supreme Court held that any further applications would have been futile and that the Mayhews' claims were ripe. *Id.*

In *Mayhew*, despite the Mayhews' submission of only one application and not applying for any variances, there was a reasonable degree of certainty that the town council would not grant any further reapplication or variance involving any development plan of 3,600 units or more. In contrast, the evidence here establishes that the Property Owners did not obtain a final decision as defined by *Mayhew* on their SUP application for a 14-unit dwelling.[5] *See City of Dallas v. Chicory Court Simpson Stuart, L.P.*, 271 S.W.3d 412, 421–22, 424 (Tex. App.—Dallas 2008, pet. denied) (distinguishing *Mayhew* and reversing denial of plea to jurisdiction where landowner obtained rejection of single drainage plan and never submitted additional alternative plan, despite city's indication it would consider one if landowner chose to submit one).

---

[5] The Property Owners also cite *City of Sherman v. Wayne*, 266 S.W.3d 34 (Tex. App.— Dallas 2008, no pet.). However, *Wayne* is distinguishable where Wayne negotiated with the planning and zoning board and agreed to concessions regarding his zoning change and SUP applications, including a more restrictive zoning level and methods to address traffic and noise concerns, but the city council rejected his applications. *Id.* at 41–42. The *Wayne* court cited *Mayhew* in highlighting how Wayne had modified his initial re-zoning application and made concessions during negotiations with the board. *Id.* at 42.

Here, flooding damage and various code issues resulted in condemnation of the property after Hurricane Ike. Ben-Amram worked with City inspectors over a period of almost two years, spending between $200,000 to $300,000, in an attempt to resolve the code issues and obtain a certificate of occupancy. Beginning in January 2010, the City required the Property Owners to submit an engineer's letter certifying the property's safety. After the City informed the Property Owners in May 2010 about the loss of their "grandfathered" non-conforming status on the property, they submitted a SUP application. They were informed of and were encouraged to, but did not, attend the meetings where the Landmark and Planning Commissions considered their application. Ben-Amram attended and spoke at the February 2011 City Council meeting. Ben-Amram acknowledged that he had not completed the repairs as to several apartments and he needed to do "some more work." The City field supervisor assigned to the property confirmed that, to date, it was not code-compliant and the City had not received the engineer's letter. One of the Landmark and Planning commissioners suggested City Council deny the SUP as "an opportunity to say go forward and meet all these [building] codes and come back with a different application." This commissioner also noted that Ben-Amram could choose to "come back with another application that is less dense."[6]

Multiple councilmembers expressed particular reservations with granting the SUP.[7] Councilmember Gonzales cited public safety and the property not meeting code requirements. Councilmember Colbert also cited public safety, the code violations, and the lack of the engineer's letter. Councilmember Greenberg

---

[6] Several of Ben-Amram's neighbors also spoke, consistently requesting denial of the application. The record reflects that several of these neighbors had been in contact with City officials to complain about the property during the renovations.

[7] Aside from asking questions about an electrical panel, Councilmember Legg expressed no particular reservations and indicated being "very open to multi-family dwelling." Councilmember Puccetti also expressed no particular reservations.

11

indicated there were "too many things wrong" for him to support the SUP, including infrastructure and engineering concerns. Beeton noted the "significant attention from code enforcement," and lack of code compliance and the engineer's letter. Beeton also mentioned possible removal of four apartments to increase green space and alleviate parking problems. Mayor Jaworski appeared to be concerned with the property's "state" and "condition," acknowledging that "money can make any property nicer," but indicated that nothing prevented Ben-Amram from submitting another application with "even a slight tweak."[8] Jaworski also suggested that Ben-Amram speak to another apartment owner operating a multi-family complex in a single-family area to "find out what his business plan was." Councilmembers Gonzales and Greenberg both discussed reconsideration of the SUP application when all or substantially all of the repairs were completed. Councilmember Greenberg especially noted that this was "the first time" City Council was considering the application. City Council denied the SUP.[9]

At the hearing, it became clear that Ben-Amram was unwilling to consider any alternative plan involving removal of any units because it would not be "realistic" and he would "go bankrupt." But he further expressed his willingness "to keep working with the [C]ity and . . . to finish the buildings up to the code." Ben-Amram acknowledged that City Council told him "that [he] can bring it up to

---

[8] Viewing the summary judgment record in the light favoring the nonmovants, *see Miranda*, 133 S.W.3d at 228, one possible "tweak" in a subsequent application could involve reducing the density of the property.

[9] Viewed in the light most favorable to the Property Owners, *see Miranda*, 133 S.W.3d at 228, although we agree that certain individual actions and statements by Jaworski and Beeton tend to reflect a preference for density reduction, for purposes of ripeness, we may not isolate individual councilmembers when determining the City's mind-set. *See City of El Paso v. Madero Dev.*, 803 S.W.2d 396, 401 (Tex. App.—El Paso 1991, writ denied), *cert. denied,* 502 U.S. 1073 (1992) (reversing trial court's judgment and dismissing based on lack of ripeness despite two city alderman stating "words to the effect that they wished to impede the development of the property by zoning the property" for more restrictive use (citing *Mayhew*)).

12

code and reapply." However, after the application was denied, Ben-Amram did not resubmit a SUP application that would have reflected completion of the repairs and/or an engineer's letter certifying the safety of the property. To the extent that City Council expressed any reservations as to parking, Ben-Amram also had indicated that he would make a "request for the parking variance" with the Zoning Board, but he did not.

Moreover, although the Property Owners insist the hearing was merely "scripted," we cannot agree that a fact issue exists on futility. There is evidence the City was open to reapplication for specific use of the property as multi-family dwellings, either: (1) with the same number of units, but after the property's repairs met all code requirements and/or the Property Owners produced an engineer's letter, or (2) with some reduction in density, namely, the four units in the newer building, ostensibly allowing for more parking or green space. According to the Property Owners, it is the second scenario that constitutes a taking.

This court faced a similar situation in *Riner v. City of Hunter's Creek*, 403 S.W.3d 919 (Tex. App.—Houston [14th Dist.] 2013, no pet.). There, the city's planning and zoning commission denied the Riners' application to replat their property to subdivide it into three lots. *Id.* at 921. Pursuant to the Riners' request, the commission certified 14 reasons for the denial of the replat. *Id.* Although the "gravamen" of the Riners' complaint was that the city misconstrued a lot-size ordinance when calculating the size of the proposed subdivided lots, they did not remedy the remaining bases for the commission's decision and then reapply, did not file an administrative appeal, and did not request any variances, so we concluded their requests for declaratory judgment were not ripe. *Id.* at 922–23, 924–26. We rejected their reliance on *Mayhew*, explaining that they "could have isolated the 'essential question' of lot size by remedying the remaining deficiencies

13

and reapplying to the commission, but they did not do so." *Id.* at 925.[10]

Here, the gravamen of the Property Owners' complaint was that the City denied their SUP application as a means of impermissibly requiring a reduction in density. However, even presuming that one basis for denial of the SUP permit was a preference for a reduced number of units, City Council expressly advanced distinct safety concerns related to the outstanding code violations on the property, as well as the still-outstanding engineer's letter. And although the Property Owners insist the parking requirement was "only a subterfuge to achieve a reduction in 'density,'" Ben-Amram testified that he never applied for a variance with the Zoning Board. The record therefore reflects that the Property Owners never isolated the essential question of density for the City's reconsideration. In other words, there was no reasonable "degree" of certainty that the City only would grant a SUP if the Property Owners agreed to remove four or more apartments. *See City of El Paso v. Madero Dev.*, 803 S.W.2d 396, 400–01 (Tex. App.—El Paso 1991, writ denied) ("After this degree is attained, the degree of taking can be arrived at.").

In these circumstances, we conclude that the Property Owners' regulatory takings claims with regard to the City's denial of the SUP application are not ripe. Therefore, the trial court erred in denying the City's plea to the jurisdiction with regard to, and we render judgment dismissing, the Property Owners' taking claims based on the denial of the SUP application. *See Chicory Court*, 271 S.W.3d at 422, 424; *Madero Dev.*, 803 S.W.2d at 400–01; *cf. Riner*, 403 S.W.3d at 925–26

---

[10] *Contra City of Harlingen v. Obra Homes, Inc.*, No. 13-02-268-CV, 2005 WL 74121, at *3 (Tex. App.—Corpus Christi Jan. 13, 2005, no pet.) (mem. op.) (claims ripe where planning and zoning commission informed landowner he was at "end of the line" as to other types of re-zoning applications and only could file application that would permit single-family homes on lot size landowner considered too large to be profitable, effectively issuing final denial of re-zoning application).

14

(trial court correctly concluded it lacked jurisdiction).

We sustain the City's issue.

## 2. Revocation of the property's non-conforming status as alleged taking

However, this does not end our inquiry. Within a supplemental brief,[11] the City contends that the Property Owners waived their right to raise any independent takings claim as to the May 2010 revocation of the property's grandfathered non-conforming status by filing the SUP application and failing to pursue an appeal with the Zoning Board of Adjustment in accordance with the zoning standards. To its supplemental brief, the City attached Ordinance Section 29-112 as the section governing appeals to the Zoning Board allegedly in effect at the time and the ordinance allegedly revising section 29-112. The Property Owners respond, taking issue with the City's attempt to supplement the record on appeal with city ordinances and arguing that it is the City which has waived this argument.

We first consider whether the Property Owners set forth a takings claim based on the City's revocation decision, apart from a takings claim based on the City's decision to deny the SUP.[12] When we review a trial court's decision on a plea to the jurisdiction, we liberally construe the pleadings in the nonmovant's favor and look to the pleader's intent. *Miranda*, 133 S.W.3d at 226; *Cnty. of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002). After reviewing the Property Owners' original petition in this favorable light,[13] we conclude that they

---

[11] The City's plea to the jurisdiction below did not address the City's revocation decision. Nor did the City's initial appellate brief. The panel directed questions specific to the revocation decision to counsel during oral argument.

[12] We can discern, and the City points to, no reason aside from "waiver" why the Property Owners would not be able to allege takings theories based on two regulatory actions by the City.

[13] We further note that the City's plea did not challenge the Property Owners' pleadings, nor did the City file special exceptions.

sufficiently alleged a regulatory taking with regard to the City's earlier decision to revoke the property's grandfathered non-conforming status pursuant to section 29-111(a)(4). In particular, under their "cause of action–inverse condemnation and regulatory taking" section, the Property Owners specifically allege and take issue with the City's intentional actions in ostensibly or purportedly invoking its zoning regulations, specifically, "the six[-]month vacancy," to require a SUP.

Moreover, although the City couches its argument in terms of waiver, in this review of the trial court's ruling on the City's plea, we construe the City's argument in a jurisdictional light. That is, because the Property Owners did not request reconsideration or a variance from the Zoning Board as to the property's revoked non-conforming status, such claim is not ripe. We do not agree with the Property Owners that the City can waive ripeness as a component of subject-matter jurisdiction because a defect in subject-matter jurisdiction can be raised at any time. *See Mayhew*, 964 S.W.2d at 928; *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993); *Madero Dev.*, 803 S.W.2d at 400.

The record reflects the City informed the Property Owners in May 2010 that due to the over-six-months lack of occupancy of the property, it had lost its non-conforming status as multiple-family dwellings under section 29-111(a)(4) of the zoning standards. The City did not inform the Property Owners regarding any potential for appeal of this revocation, and instead indicated that a SUP application must be reviewed by the Landmark and Planning Commissions and approved by City Council prior to reoccupancy. Ben-Amram testified that the City did not inform him of any right to appeal.

16

Although there have been instances where appellate courts have taken judicial notice of municipal ordinances,[14] the City did not request that this court take judicial notice of the ordinance under Texas Rule of Evidence 204, the trial court did not take judicial notice of or indicate familiarity with the contents of section 29-112, only one of the City's submissions was certified, and the Property Owners here object to supplementation of the record. Further, even if we were to take judicial notice of the contents of section 29-112, i.e., that the Property Owners had the ability to appeal to the Zoning Board within a reasonable time, the City did not elicit testimony from Ben-Amram or anyone else such as from the Zoning Board that the Property Owners did not in fact do so.[15] The evidence in the record as to ripeness is focused on Ben-Amram's lack of SUP reapplication or application for a parking variance with regard to the City's denial of the SUP, not any alleged failure to obtain a final decision as to the City's removal of the property's grandfathered non-conforming status.

We conclude the City has not met its burden to establish that its revocation decision was not final and authoritative. *See Miranda*, 133 S.W.3d at 228; *Mayhew*, 964 S.W.2d at 929. Therefore, the trial court did not commit any error by denying the City's plea with regard to an alleged taking based on the City's revocation of the property's non-conforming status.

We overrule such issue as presented in the City's supplemental brief.

---

[14] *E.g., City Of Houston v. O'Fiel*, No. 01-08-00242-CV, 2009 WL 214350, at *1 n.1 (Tex. App.—Houston [1st Dist.] Jan. 29, 2009, pet. denied) (mem. op.); *City of Farmers Branch v. Ramos*, 235 S.W.3d 462, 469 (Tex. App.—Dallas 2007, no pet.); *Leonard v. Burge*, 74 S.W.3d 135, 137 (Tex. App.—Beaumont 2002, pet. denied).

[15] Testimony from Ben-Amram that he was not told of any right to appeal is not the same as evidence that he did not do so.

### III.     CONCLUSION

In light of the foregoing, we affirm in part the trial court's denial of the City's plea to the jurisdiction with regard to the Property Owners' takings claims based on the City's revocation of the property's grandfathered non-conforming status, and reverse in part the trial court's denial of the City's plea and render judgment dismissing the Property Owners' takings claims with regard to the City's denial of the SUP application.


/s/     Marc W. Brown
Justice


Panel consists of Justices McCally, Brown, and Wise.

18