**Opinion issued June 27, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-17-00442-CV

———————————

**ALAN SCHROCK, Appellant**

**V.**

**CITY OF BAYTOWN, Appellee**

---

**On Appeal from the County Civil Court at Law No. 1**
**Harris County, Texas**
**Trial Court Case No. 1007923**

---

## O P I N I O N

Appellant, Alan Schrock, challenges the trial court's judgment, rendered after a jury trial, in favor of appellee, City of Baytown (the "City"), in Schrock's suit

against the City for taking his property[1] and for a declaratory judgment.[2] In two issues, Schrock contends that the trial court erred in granting the City a directed verdict on his claims.

We affirm in part and reverse and remand in part.

## Background

This is the second appeal we have heard involving these parties.[3] In his previous appeal, Schrock challenged the trial court's rendition of summary judgment against him on his regulatory-taking and declaratory-judgment claims.[4] We held that the trial court erred in granting the City summary judgment and dismissing Schrock's claims, and we reversed the trial court's judgment and remanded the case to the trial court for further proceedings consistent with our opinion.[5]

In his second amended petition, Schrock alleged that in 1993, he purchased a house at 606 Vista Avenue in the City to use as a rental property (the "property"), which he did until approximately January 2010. Each time that Schrock leased the property to a new tenant, the City required, before it would connect utility services, including water service, in the tenant's name, that the tenant pay a deposit and

---

[1]     *See* U.S. CONST. amend. V; TEX. CONST. art. I, § 17.

[2]     *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.001–.011.

[3]     *See Schrock v. City of Baytown*, No. 01-13-00618-CV, 2015 WL 8486504 (Tex. App.—Houston [1st Dist.] Dec. 10, 2015, pet. denied) (mem. op.).

[4]     *See id.* at *1, *4–9.

[5]     *See id.*

2

provide a copy of the lease agreement related to the property. Thus, whenever a new tenancy began, Schrock provided the City with a copy of the lease agreement, either by furnishing his new tenant with an extra copy to give to the City or by giving a copy of the lease agreement directly to the City himself.

In 2009, the City notified Schrock that he owed it $1,999.67 for unpaid utility services provided by the City to the property for ten of Schrock's prior tenants, dating back to 1993. The City gave Schrock copies of the relevant billing invoices, listing the names and account numbers of his prior delinquent tenants. The City demanded that Schrock pay the outstanding sum within fourteen days to avoid having a lien placed on the property. Schrock disputed the charges for utility services and requested an administrative hearing.

After a hearing, the City reduced the amount owed by Schrock to $1,157.39 for unpaid utility bills that had accrued over the preceding four years, rather than the preceding sixteen years. And it gave Schrock fourteen days to pay. Although after the administrative hearing, the City sent Schrock's attorney a notice detailing its decision, Schrock's attorney misfiled the notice. Because Schrock was not aware of the City's decision, he did not pay the sum assessed by the City, and on June 1, 2009, the City filed a lien against the property for unpaid utility services that it had provided directly to Schrock's tenants who had previously resided at the property. According to Schrock, the City failed to perfect its lien or provide him with notice

3

of the lien or his right to appeal. And the City continued to provide utility services, including water service, to the property until January 2010, when, pursuant to an ordinance, the City refused to provide services to Schrock's new tenant.[6]

In 1991, the City had enacted an ordinance requiring landlords who wished to prevent the City from filing liens against their rental properties and discontinuing utility services to those properties to submit a "declaration" that their properties were rental properties, which they did not wish to be security for their tenants' utility bills.[7]

Even so, according to Schrock, he complied with the City's ordinance each time that he leased the property to a new tenant because he provided a copy of the lease agreement to the City, either directly or through his tenant. And the City charged new tenants a higher deposit to connect utility services to the property

---

[6]     *See* Baytown, Tex., Code of Ordinances, ch. 98, art. III, § 98-65(g) (1967) (amended 1991) ("No water, garbage or sewer services shall be provided to property encumbered by a lien filed pursuant to this section.").

[7]     *See id.* § 98-65(i) (amended 1991) ("The owner of any property, which property is rented to another and such tenant carries [C]ity water, sewer or garbage collection services in the tenant's name, may prevent the [C]ity from using that property as security for the water, sewer and garbage collection service charges for service to that property and from filing any lien on such property under this section by filing with the [C]ity utility billing division a declaration in writing specifically naming the service address of that property and declaring such to be rental property, which the owner does not wish to be security for the water, sewer and garbage collection service charges for service to that property.").

because of their status as tenants.[8]  Thus, Schrock alleged that the City, at all times, had notice that Schrock used the property as rental property.  Also, Schrock asserted that he had complied with the Texas Local Government Code, which provides that a "municipality's lien shall not apply to bills for service connected in a tenant's name after notice by the property owner to the municipality that the property is rental property."[9]  The Local Government Code prohibits requiring, as a condition of connecting service, a third-party guarantee of a customer's utility bill or requiring, as a condition of connecting or continuing service, a customer to pay for service previously furnished to another customer at the same address.[10]

Later, in 2011, the City amended its ordinance, removing the requirement that a landlord file a "declaration."  Rather, if the City "knows" that a property is occupied by a tenant, it may not file a lien against the property; however, it may report the tenant's delinquency to a credit bureau.[11]  In 2012, the City further

---

[8]  *See id.* § 98-65(i)(2) (amended 1991) (when rental declaration on file "the [C]ity shall collect a deposit in the amount of $125.00"); *see also* Baytown, Tex., Code of Ordinances, ch. 98, art. III, § 98-56(a), (b) (1967) (amended 2011) ("Whenever a consumer desires to establish service with the utility billing division, he shall tender to such division . . . the proper deposit. . . . A residential consumer occupying a single-family dwelling house shall be required to place on deposit the amount of $50.00 if he is the owner of the dwelling house; however, a residential consumer occupying a single-family dwelling house shall be required to place on deposit the amount of $200.00 if he is not the owner of the dwelling house.").

[9]  *See* TEX. LOC. GOV'T CODE ANN. § 552.0025(e).

[10]  *See id.* § 552.0025(a), (b).

[11]  *See* Baytown, Tex., Code of Ordinances, ch. 98, art. III, § 98-65(d)(4) (1967) (amended 2011) ("No lien for water charges, garbage collection charges, or sewer

5

amended its ordinance, allowing utility services to continue to be provided to a property in accordance with the Local Government Code.[12]

Schrock brought regulatory-taking[13] and declaratory-judgment[14] claims against the City. Regarding his regulatory-taking claim, Schrock alleged that since January 2010, the City had refused to provide water service to the property, and without water service, Schrock was not able to use the property as a rental property. Accordingly, Schrock was denied all economically viable use of the property, and the property fell into disrepair and became uninhabitable. Schrock never received any compensation from the City for its regulatory taking of his property.

Schrock further alleged that the City's actions, in the enactment and enforcement of its ordinance,[15] constituted an unreasonable interference with his right to use and enjoy the property and an "unlawful exercise of police

---

charges shall be placed on a property if . . . [t]he [C]ity knows the property to be a single-family dwelling house and the delinquent water charges, garbage collection charges, or sewer charges to be for services provided to a residential consumer who is not the owner of the property."); *see id.* § 98-65(i) (1967) (amended 2011) (repealing former subsection (i), entitled "Rental property," and renumbering former subsection (j), entitled "Effect of section," as subsection (i)).

[12] *See id.* § 98-65(g) (1967) (amended 2012) ("No water, garbage or sewer services shall be provided to property encumbered by a lien filed pursuant to this section, except as otherwise required by . . . Local Government Code § 552.0025.").

[13] *See* U.S. CONST. amend. V; TEX. CONST. art. I, § 17.

[14] *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.001–.011.

[15] *See* Baytown, Tex., Code of Ordinances, ch. 98, art. III, § 98-65(g), (i) (amended 1991).

power . . . . which primarily and adversely affected a small number of landlords of single[-]family residences." According to Schrock, from 1991 to 2012, the City filed eighteen liens against rental properties, but only eight remained, including the lien on his property.[16] He argued that the City's enforcement of its ordinance was not "in response to a great public necessity," but constituted an "attempt to coerce a small number of landlords into paying their tenants' water bills" out of convenience because it was difficult for the City to collect from tenants who had moved. Schrock, on his regulatory-taking claim, sought "all actual damages resulting from the [City's] inverse condemnation of his [p]roperty."

Regarding his declaratory-judgment claim, Schrock sought a declaration that the City's enforcement of its ordinance[17] against him in 2010 "resulted in the inverse condemnation of [his] property for which no just compensation [was] paid." Further, Schrock sought a declaration that certain sections of the City's ordinance,[18] prior to their amendment, were "invalid, illegal, and/or unconstitutional" and conflicted with the Local Government Code.[19] And he sought a "clarification as to the validity of [the City's] utility lien" as well as a "clarification as to his rights under the current

---

[16]    It is undisputed that in June 2013, the City released its lien against the property.

[17]    *See id.*

[18]    *See id.*

[19]    *See* TEX. LOC. GOV'T CODE ANN. § 552.0025.

version" of the City's ordinance[20] and as to whether the City "c[ould] lawfully prevent [his] tenants from obtaining utility service[s] at the [p]roperty."

In its fourth amended answer, the City generally denied Schrock's claims and asserted certain affirmative defenses.

At trial, Schrock testified that in 1993, he purchased the property, which was a ten-year-old mobile home, for $21,000. In 2006 or 2007, Schrock spent $5,000 to $5,500 renovating the property, which included rebuilding the outer walls, installing and painting new siding, and installing new insulation. The trial court admitted into evidence photographs of the property after the renovation, but before any utility services were suspended by the City. In Schrock's opinion, the property would "have held up another 10 or 15 years with the new siding on it."

According to Schrock, he always intended to use the property as a rental property. And since 1993, he consistently rented the property, with never more than a one or two week gap in between tenants. In other words, Schrock "always ha[d] another tenant to move in" to the property, and that tenant would pay Schrock a deposit prior to the previous tenant even vacating. Regarding rent, Schrock testified that his tenants paid less than $2,000 a month and were generally lower-income individuals. The last tenant with whom Schrock signed a lease agreement was

---

[20]    *See* Baytown, Tex., Code of Ordinances, ch. 98, art. III, § 98-65(g) (amended 2011 and 2012).

required to pay a $400 deposit and $600 each month for rent. Schrock never foresaw a reason that would prevent him from using the property as a rental property.

Schrock explained that the lease agreement that he signed with each of his tenants required the tenant to provide and pay for his own utility services related to the property. And his tenants provided the City with a copy of their lease agreements when seeking the connection of utility services. According to Schrock, tenants were required to provide $125 deposits to the City for the connection of utility services, including water service, while owners of properties were only required to pay $50 deposits.

Schrock further testified that on March 31, 2009, the City sent him a letter, a copy of which the trial court admitted into evidence, stating that, as the owner of the property, he was responsible for "outstanding balances total[ing] . . . $1,999.67" related to unpaid utility services provided by the City to Schrock's tenants from 1993 through 2009. The City, in its letter, essentially wanted him to claim responsibility for the outstanding balances of ten of his previous tenants based on a 1991 City ordinance, which provided, at that time:

**Sec. 98-65. Liens.**

(a) *Water.* Liens for unpaid water charges shall be filed according to the following:

(1) After the [C]ity has terminated a customer's water . . . , the supervisor of the utility billing division shall file a lien on the property served by the terminated water service and in the amount the customer

9

whose service was terminated owed to the [C]ity for water service at the time of the termination of services.

. . . .

(g)    *Reconnection of services*.   No water, garbage or sewer services shall be provided to property encumbered by a lien filed pursuant to this section.  However, the supervisor of the utility billing division shall be authorized to reconnect water, garbage and wastewater services if the customer agrees in writing to pay the accrued water and wastewater charges for [the] property . . . .

. . . .

(i)    *Rental Property.*

(1)    The owner of any property, which property is rented to another and such tenant carries [C]ity water, sewer or garbage collection services in the tenant's name, may prevent the [C]ity from using that property as security for the water, sewer and garbage collection service charges for service to that property and from filing any lien on such property under this section by filing with the [C]ity utility billing division a declaration in writing specifically naming the service address of that property and declaring such to be rental property, which the owner does not wish to be security for the water, sewer and garbage collection service charges for service to that property.[21]

According to Schrock, he did not know of the ordinance's requirement of a "Rental Property Declaration" until he received the City's letter.  And he had no idea that he could possibly be responsible for the outstanding balances for utility services owed by his tenants.  In fact, his lease agreement with his tenants stated that they were to pay for utility services; Schrock "had nothing to do with it."  And Schrock had never

---

[21]    The trial court admitted into evidence a copy of the City's ordinance prior to its amendments in 2011 and 2012.  *See id.* § 98-65(a), (g), (i) (amended 1991).

received a letter from the City like the March 31, 2009 letter, and he owned approximately thirty-five rental properties by 2009.

Schrock also noted, in regard to the City's ordinance, that it conflicted with Texas law, which states that an "entity . . . cannot hold a third party responsible for somebody else's bill. In other words, the City had an agreement with the customer and they c[ould not] come along and make a third party responsible for th[e] [customer's] bill." Essentially, the City "couldn't do what they were doing."[22]

In response to the City's March 31, 2009 letter, Schrock sought a hearing "to contest the amount due and owing and/or [the] proposed lien" on the property. On April 21, 2009, a hearing was held during which Schrock was told that "the[] law" stated that "landlords of properties had to pay the water bills from [their] tenants that didn't pay [them]." Schrock agreed that, at the time of the hearing, he was the owner of the property and he had not yet filed with the City a "Rental Property Declaration" for the property.

---

[22] The City concedes in its briefing that its ordinance, prior to its amendment in 2011 and 2012, "contradicted state law." *See* TEX. LOC. GOV'T CODE ANN. § 552.0025 ("Connection, Disconnection, and Liability for Municipal Utility Services"). The trial court admitted into evidence a copy of the City's amended ordinance, which created four "[e]xemptions" from the placement of liens for utility charges on a property and removed the requirement of a "Rental Property Declaration." *See* Baytown, Tex., Code of Ordinances, ch. 98, art. III, § 98-65(d), (g), (i) (amended 2011 and 2012).

Following the hearing, on April 24, 2009, the City sent Schrock a letter regarding its "[d]ecision concerning the appeal of the imposition of lien for unpaid utility services." That letter, a copy of which the trial court admitted into evidence, states:

> After having considered the testimony received at the hearing held on April 21, 2009, regarding the City's decision to impose a lien for unpaid utility services and after reviewing the billing records together with the Code of Ordinances of the City of Baytown, [the City] ha[s] determined that a lien in the following amount[] should be placed on the property as indicated hereinbelow:

| Property Address | Account Number | Lien Amount |
|---|---|---|
| 606 Vista, Baytown, Texas | 1071-00625 | $1,157.39 |

> Such amount reflects the cost of utility services provided to the above-referenced property for only the past four years and excludes all late charges. . . .
>
> This decision is based upon the following facts presented at the hearing, namely that:
>
> 1.  . . . Schrock admitted that he was the owner of the property at all times during which the unpaid utility services were provided by the City;
>
> 2.  [T]he property has not been and cannot be declared as a homestead;
>
> 3.  [T]here was no evidence presented contesting [the] above-referenced amount[] for services provided to . . . [the] property; and

12

4. [T]here was no rental declaration on file for the time period in question declaring that . . . Schrock d[id] not wish the property to be used as security for the utility service[] charges for services to the property.

To avoid the imposition of [a] lien, . . . Schrock . . . must pay the above-referenced amount and send a check for the same to[] . . . [the City] on or before fourteen calendar days from the date of this letter. If payment has not been received or a payment arrangement has not been made within such time frame, the City shall no longer be stayed from the imposition of the lien in the amount referenced hereinabove. If a lien is filed, please be advised that the cost of the same will be included and such lien will bear interest . . . .

Schrock stated that he did not receive the City's letter or become aware of it because his attorney misfiled the letter in another client's file. However, Schrock also testified that he knew about the City's letter, and he knew that if he paid $1,157.39 a lien would not be attached to the property. According to Schrock, he was financially able to pay the lien at that time.

On May 1, 2009, Schrock submitted a "Rental Property Declaration" related to the property, asserting that the property constituted a rental property and that he did not "wish [the property] to be security for the water, sewer and garbage collection service charges for service to th[e] property." Although Schrock explained that the City always knew that the property constituted a rental property based on the deposits it had received from his tenants and the lease agreements that were required to be provided for such deposits, he still completed the declaration based on the advice of his attorney.

13

On May 27, 2009, the City executed a lien, and on June 1, 2009, the City filed the lien in the Harris County real property records. At the time that the City executed and filed its lien, a tenant lived at the property and the City was providing utility services, including water service, to the property. Thus, Schrock explained that he was not initially harmed by the execution of the lien, and he was not even aware of its attachment to the property in June 2009. Schrock noted that, at the time that the City executed and filed its lien, he had already filed the required "Rental Property Declaration" for the property.

At the end of December 2009, Schrock's tenant moved out of the property, and Schrock signed a lease agreement with a new tenant, George Cuellar, on or about January 10, 2010. When Cuellar moved to the property, he sought to have water service to the property "turned on." On or about January 20, 2010, Cuellar's wife, went to the City, with a copy of Cuellar's lease agreement, but a City employee told her that water service to the property could not be connected until the City spoke with Schrock. When Schrock spoke to the City that same day, he was told that the City would not provide utility services, including water service, to the property unless Schrock paid the lien attached to the property. According to Schrock, this was the first time that he ever became aware that the City had attached a lien to the property. At that time, Schrock was told by a City employee that it would cost $1,251.59 to pay off the lien, interest, and the filing fee.

When Schrock went to pay the lien; however, he was told that he was required to pay $1,415.76, rather than $1,251.59, because Schrock was also liable for the unpaid "water bill" of his last tenant who vacated the property in December 2009. In other words, Schrock was told, in addition to paying the lien amount, he was responsible for "pay[ing] [his] last tenant's water bill before [his] new tenant c[ould] get [water] service." According to Schrock, his tenant's unpaid water bill did not accrue until after the City had filed its lien on June 1, 2009; and, essentially, he was being asked to pay more to have the lien released than the actual cost of the lien itself. At trial, the court admitted into evidence a copy of certain e-mails between employees of the City, which confirmed that the unpaid water bill of Schrock's last tenant "was not included in the lien."

Although Schrock was financially able to pay the $1,415.76 amount in January 2010, he did not bring a check with him to cover the additional amount subsequently requested by the City. Thus, Schrock did not pay the $1,415.76 on or about January 20, 2010, and the City refused to connect utility services, including water service, to the property that day. When Cuellar learned that he could not obtain utility services for the property, he immediately moved out of the property. As a result, Schrock refunded Cuellar his $600 rent payment and his $400 deposit, and he reimbursed Cuellar for the deposits that Cuellar had made for gas and electricity. At the time that Cuellar vacated the property, Schrock did not have another tenant to

15

rent the property.  Schrock explained that he was harmed because the lien placed on the property prevented any new tenant from securing utility services, including water service for the property.

On October 19, 2010, Schrock, on the advice of his attorney, attempted to pay the lien attached to his property for a second time.  On that day, he was told that he would have to pay $1,502.01, in order to have utility services turned back on at the property, which included the lien amount, interest, a filing fee, and his last tenant's unpaid water bill.  Schrock noted that the lien amount remained unchanged, even though in May 2010, one of his former tenants paid his delinquent utilities account with the City.  Additionally, when Schrock went to make his lien payment, the City informed him that he would need to also address his "other 19 accounts" related to the other nineteen rental properties that he owned at the time.  In other words, according to Schrock, he was told that he "had to pay everything that had ever been on any of [his] rent houses," which "could have been as much as 19 times" $1,500.  Thus, Schrock believed that paying the lien attached to the property would not ultimately resolve his situation with the City.

Schrock further testified that at the time that he attempted to pay the lien for the second time, in October 2010, the property was still vacant and he could not rent it to anyone because the City would not provide utility services to a new tenant.  And Schrock explained that if he did rent the property to a new tenant, but had not paid

16

the lien attached to the property, the City would simply deny services to that new tenant, as it had in the past.

Regarding the condition of the property, after the City stopped providing utility services to the property in January 2010, it became difficult for Schrock to maintain without a tenant living there. For instance, although Schrock "check[ed]" on the property once a week, rats gained access to the property through "the back of the cabinets," under the stove, and "the heating unit in the hall." The rats went "up in[to] the ceiling" and ate holes. Additionally, mold grew in various places inside the property, and in 2012, the property was "broken into by kids a couple of times [who] pretty much tore up [the] inside." According to Schrock, those individuals "tore the walls up," tore out the light fixtures and ceiling fans, "busted windows," ripped the doors off of cabinets, "pulled . . . pieces of the flooring up," and vandalized the air-conditioning unit. Further, Schrock testified that because the property was vacant for an extended period of time, the City "disconnect[ed] the . . . power wires," "pull[ed] the [electrical] meter out," and removed the gas meter.

The trial court admitted into evidence photographs of the property taken in 2012 after the property had been vandalized. Schrock explained that the photographs depicted the damage due to the vandalism, but also the damage done by rats and mold that had grown at the property. The trial court also admitted into

17

evidence photographs of the property taken "[v]ery recent[ly]," within three weeks or a month of trial.

Schrock testified that if the City had provided utility services, including water service, to the property then the property would have been occupied and the aforementioned damages would not have occurred. In fact, according to Schrock, no one had ever broken into any of his other rental properties, which all had tenants. In Schrock's opinion, the property was not currently habitable. And in order to make the property habitable, he would need to repair all of the walls, install new appliances, install a new air-conditioning system, replace the carpet, have "electric reconnected," "test the gas pipes . . . and have the gas meter reconnected," and potentially replace some wood on the exterior of the property. Schrock explained that it would cost $1,100 to have the "power wires" reconnected and the electrical meter replaced. It would also cost $400 to have the gas meter put back in, and approximately $4,922.52 to replace the air-conditioning system. Additionally, because of the rats, mold, and vandalism at the property, it would cost $8,500 to repair the drywall, approximately $2,000 to replace the carpet, and approximately $500 to replace the refrigerator, which had "complete[ly] rust[ed]" because the property was vacant. According to Schrock, nothing was "wrong" with the property before the City stopped providing utility services. At the time of trial, the property did not have utility services, including water service connected.

Schrock further explained that, in general, he had accumulated approximately twenty to thirty rental properties in the City and he originally planned to purchase three houses a year until he reached the age of sixty-five. At that time, he would begin selling the properties and using the money from those sales to support himself. However, once the City stopped providing utility services to the property in January 2010, he stopped buying rental properties, having bought his last two properties in 2009 or 2010. In Schrock's opinion, if the City had not tried to make him pay for his tenant's unpaid utility services then he would have continued with his investment plan.

On cross-examination, Schrock noted that he had never had difficulty securing utility services for his own home. And he testified that in 2012 he, based on the advice of a City employee, actually requested that "the water [for the property] . . . be turned on, like an emergency turn-on," by the City so that he could clean the property to remove the mold and rats. The trial court admitted into evidence a copy of Schrock's faxed request, dated February 28, 2012, which states: "To the City of Baytown [W]ater Dept. Please turn on the water service at [the property] ASAP using my 888 account with the floating deposit." When he made the request, Schrock was unsure whether the City would actually restore water service to the property.

19

Schrock further testified that on or about March 2, 2012, the City restored water service at the property, and on April 30, 2012, Schrock requested that the City turn off the water service. After he had the water service to the property temporarily restored, Schrock did not try to rent the property to a new tenant because it was "unrentable" or unlivable, as the electrical wires had been disconnected, there was no gas for the property, and it was infested with rats. According to Schrock, a City employee told him that "it was a mistake for [the City] to [have] turn[ed] [the] water back on" in 2012.

On June 13, 2013, the City released the lien attached to the property, and it filed the release in the Harris County real property records. Schrock conceded that he did not know whether, at the time of trial, the City would provide utility services, including water service, to a new tenant at the property since it was no longer encumbered by the lien. When asked whether the City ever said that he could not rent out the property, Schrock responded, "Not those words, no." However, Schrock also testified that although the lien no longer encumbered his property, the City had never told him that he was not responsible for his tenants' unpaid utility bills, and he did not know of anything preventing the City from attaching another lien to the property. Schrock never paid the lien that the City attached to his property in 2009.

Kevin Troller, assistant city manager for the City, testified that, in accordance with the City's ordinance, if a property owner had a "Rental Property Declaration"

on file, the City "would go after the tenant" for any unpaid utility services. However, if there was no "Rental Property Declaration" on file, then the City "would go after the [property] owner if [his] tenant did not pay." Troller conceded that irrespective of a "Rental Property Declaration" the City would have been aware whether the individual seeking utility services, including water service, at a given property was a property owner or a tenant and whether a property was a rental property because the deposit required for the installation of utility services depended on whether an individual was a property owner or a tenant. When asked whether "the City would be on notice at that point whether or not the property is [a] rental property," Troller stated, "Yes, sir."

Troller further testified that the City's ordinance was amended after 2010, and it no longer requires that "a third-party or [property] owner . . . be held responsible for someone else's [utility] bill." Troller stated that he was not aware that the City's ordinance, prior to its amendment, conflicted with Texas law.

After Schrock rested his case, the City orally moved for a directed verdict on Schrock's regulatory-taking claim, arguing that there were no disputed issues of material fact related to Schrock's regulatory-taking claim; the question of whether there was a regulatory taking was a question of law; the City's action did not constitute a taking as a matter of law; and there was no evidence that the City was responsible for Schrock's damages because "a substantial amount of the

21

damages . . . related to vandalism of the property" were unrelated to the purported regulatory taking. The trial court granted the City's motion and entered a directed verdict, holding that Schrock take nothing on his regulatory-taking claim and his declaratory-judgment claim against the City. Schrock filed a motion for new trial, which was overruled by operation of law.

## Standard of Review

We review the trial court's grant of directed verdict de novo. *JP Morgan Chase Bank, N.A., v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018); *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). Directed verdicts are reviewed under the same legal-sufficiency standard that applies to no-evidence summary judgments. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). We sustain a legal-sufficiency point when (1) there is a complete absence of evidence regarding a vital fact, (2) rules of law or evidence preclude according weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810. We consider the evidence in the light most favorable to the nonmovant, crediting evidence a reasonable jury could credit and disregarding contrary evidence and inferences unless a reasonable jury could not. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 (Tex. 2010); *City of Keller*, 168 S.W.3d at 827. Conclusive

22

evidence cannot be disregarded.  *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *see also City of Keller*, 168 S.W.3d at 816 ("Evidence is conclusive only if reasonable people could not differ in their conclusions . . . .").

The nonmovant bears the burden of identifying evidence before the trial court that raises a genuine issue of material fact as to each challenged element of his cause of action.  *See Boerjan v. Rodriguez*, 436 S.W.3d 307, 310 (Tex. 2014).  A directed verdict in favor of the defendant is proper if the plaintiff "fails to present evidence raising a fact issue essential to [his] right of recovery," or the plaintiff "admits or the evidence conclusively establishes a defense to [his] cause of action." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).  We may affirm a directed verdict on any ground that supports it.  *RSL-3B-IL, Ltd. v. Prudential Ins. Co. of Am.*, 470 S.W.3d 131, 136 (Tex. App.—Houston [1st Dist.] 2015, pet. denied); *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 443 (Tex. App.—Dallas 2002, pet. denied).  However, if there is evidence that raises a material fact issue on any theory of recovery, a directed verdict is improper and the case must be reversed and remanded.  *See Cox v. S. Garrett, L.L.C.*, 245 S.W.3d 574, 578 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citing *Szczepanik v. First S. Tr. Co.*, 883 S.W.2d 648, 649 (Tex. 1994)).

**Regulatory-Taking Claim**

In his first issue, Schrock argues that the trial court erred in granting a directed verdict that Schrock take nothing on his regulatory-taking claim because "there were material fact issues to be determined by the jury."

The Fifth Amendment of the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amend. V. This constitutional protection has been incorporated through the Fourteenth Amendment to apply to the individual states. *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 175 n.1 (1985); *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 477 n.19 (Tex. 2012). Similarly, Article I, section 17 of the Texas Constitution guarantees that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made." TEX. CONST. art. I, § 17(a). Our case law on takings under the Texas Constitution is consistent with federal jurisprudence, and we consider federal and state takings claims together, as the analysis for both is complementary. *Hearts Bluff Game Ranch*, 381 S.W.3d at 477; *see also Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 669 (Tex. 2004) (although takings provisions in state and federal constitutions worded differently, they are comparable).

A property owner whose property has been taken, damaged, destroyed for, or applied to public use without adequate compensation may bring an inverse condemnation claim. *City of Abilene v. Burk Royalty Co.*, 470 S.W.2d 643, 646 (Tex. 1971); *City of Hous. v. Boyle*, 148 S.W.3d 171, 177 (Tex. App.—Houston [1st Dist.] 2004, no pet.); *see also City of Hous. v. Carlson*, 451 S.W.3d 828, 831 (Tex. 2014) (where property owner believes compensation due, he may seek redress via inverse-condemnation claim). The claim is denominated as "inverse" because the property owner asserts the claim. *City of Hous. v. Texan Land & Cattle Co.*, 138 S.W.3d 382, 387 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (internal quotations omitted).

Takings can be classified as either physical or regulatory takings. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998). A physical taking occurs when the government authorizes an unwarranted physical occupation of an individual's property, whereas a regulatory taking occurs when a government's regulation injures the property's value or usefulness. *See Lowenberg v. City of Dall.*, 168 S.W.3d 800, 801–02 (Tex. 2005); *Mayhew*, 964 S.W.2d at 933; *see also City of Dall. v. Blanton*, 200 S.W.3d 266, 271 (Tex. App.—Dallas 2006, no pet.) ("A compensable regulatory taking can occur when [the] government[] . . . imposes restrictions that either deny a property owner all economically viable use of his

25

property or unreasonably interfere[] with the owner's right to use and enjoy the property.").

The United States Supreme Court and the Texas Supreme Court have recognized several theories of regulatory takings. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538–40 (2005); *Edwards Aquifer Auth. v. Day*, 369 S.W.3d 814, 838–39 (Tex. 2012); *City of Sherman v. Wayne*, 266 S.W.3d 34, 42–44 (Tex. App.—Dallas 2008, no pet.) ("At least three theories of regulatory takings have been discussed by the United States Supreme Court and the Texas Supreme Court . . . ."). Relevant to the instant case, a regulation may constitute a taking necessitating compensation if, under an "essentially ad hoc, factual inquir[y]," the government action unreasonably interferes with a property owner's use and enjoyment of the property. *Sheffield*, 140 S.W.3d at 672–73 (citing *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978)).

To determine whether a regulatory taking has resulted from the government's unreasonable interference with a property owner's right to use and enjoy his property, courts must consider the following three factors: (1) the economic impact of the regulation on the property owner; (2) the extent to which the regulation interferes with the property owner's distinct investment-backed expectations; and (3) the character of the governmental action. *Id.* (citing *Penn Cent.*, 438 U.S. at 124); *Mayhew*, 964 S.W.2d at 935–36; *City of Hous. v. Maguire Oil Co.*, 342 S.W.3d

726, 736 & n.7 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). These factors are not exclusive and no single factor is determinative. *Day*, 369 S.W.3d at 840; *Sheffield*, 140 S.W.3d at 672–73. A regulatory-taking analysis requires consideration of all the relevant surrounding circumstances. *Sheffield*, 140 S.W.3d at 672–73.

## A. Economic Impact

The first factor, the economic impact of the regulation on the property owner, "compares the value that has been taken from the property with the value that remains in the property." *Mayhew*, 964 S.W.2d at 935–36. In other words, the proper inquiry considers the diminution in the value of the property brought on by the regulation in question. *Edwards Aquifer Auth. v. Bragg*, 421 S.W.3d 118, 139 (Tex. App.—San Antonio 2013, pet. denied). Lost profits and lost investment are relevant factors to consider in assessing the value of a property and the severity of the economic impact on a property owner. *Sheffield*, 140 S.W.3d at 677; *see also Cty. of El Paso v. Navar*, 511 S.W.3d 624, 631 (Tex. App.—El Paso 2015, no pet.) ("Lost profits are one relevant factor to consider in assessing the severity of the economic impact of governmental action, especially when the property affected has had a proven, profitable use at the time of the government action."); *Wayne*, 266 S.W.3d at 45 ("[I]t is incorrect to say that profit is not a consideration in determining the value of property."); *Park v. City of San Antonio*, 230 S.W.3d 860, 869 (Tex.

27

App.—San Antonio 2007, pet. denied); *see also Schrock v. City of Baytown*, No. 01-13-00618-CV, 2015 WL 8486504, at *5 (Tex. App.—Houston [1st Dist.] Dec. 10, 2015, pet. denied) (mem. op.) (explaining "lost rents" consideration in economic-impact analysis and recognizing "a property owner has a constitutionally protected property interest in lost rents"). Further, a property owner's inability to continue renting his property due to the government's regulation may constitute evidence of the economic impact. *See Village of Tiki Island v. Ronquille*, 463 S.W.3d 562, 578–79 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

Schrock testified that he purchased the property in 1993 for $21,000. In 2006 or 2007, he spent $5,000 to $5,500 renovating the property, which included rebuilding the outer walls, installing and painting new siding, and installing new insulation. The trial court admitted into evidence photographs of the property after the renovation, but before any utility services were suspended by the City. Schrock opined that the property would "have held up another 10 or 15 years with the new siding on it."

From 1993 until January 2010, Schrock consistently rented the property, with never more than a one or two week gap in between tenants. According to Schrock, he "always ha[d] another tenant to move in" to the property. Schrock testified that his tenants paid less than $2,000 a month and his last tenant was required to pay $600 a month in rent and a $400 deposit.

28

In January 2010, Schrock signed a lease agreement with a new tenant, Cuellar. However, when Cuellar, on or about January 20, 2010, sought to have water service to the property "turned on," the City refused to do so unless Schrock paid the cost of the lien that the City had attached to his property as well as interest, a filing fee, and the unpaid "water bill" of one of Schrock's former tenants that accrued after the City had filed its lien. Because Schrock could not pay the amount owed on or about January 20, 2010, Cuellar vacated the property immediately because the City refused to provide water service. As a result, Schrock refunded Cuellar his $600 rent payment and his $400 deposit, and he reimbursed Cuellar for the deposits that he had made for gas and electricity. At the time that Cuellar vacated the property, Schrock did not have another tenant to rent the property. According to Schrock, the lien placed on the property prevented any new tenant from securing utility services, including water service, for the property, and thus, prevented Schrock from renting the property from January 2010 onward.

Schrock further testified that after the City stopped providing utility services to the property in January 2010, it became difficult to maintain the property without a tenant living there. For instance, rats gained access to the property through "the back of the cabinets," under the stove, and "the heating unit in the hall." The rats also went "up in[to] the ceiling" and ate holes. Additionally, mold grew in various places inside the property, and in 2012, the property was "broken into by kids a

29

couple of times [who] pretty much tore up [the] inside." Those individuals "tore the walls up," tore out the light fixtures and ceiling fans, "busted windows," ripped the doors off of cabinets, "pulled . . . pieces of the flooring up," and vandalized the air-conditioning unit. Further, because the property was vacant for an extended period of time, the City "disconnect[ed] the . . . power wires," "pull[ed] the [electrical] meter out," and removed the gas meter. According to Schrock, the property became uninhabitable.

Schrock also explained that if the City had provided utility services, including water service, to the property then the property would have been occupied and the aforementioned damages would not have occurred. In fact, no one had ever broken into any of his other rental properties, which all had tenants.

In order to make the property habitable again, Schrock testified that it would cost $1,100 to have the "power wires" reconnected and the electrical meter replaced. It would also cost $400 to have the gas meter put back in, and approximately $4,922.52 to replace the air-conditioning system. Additionally, because of the rats, mold, and vandalism at the property, it would cost $8,500 to repair the drywall, approximately $2,000 to replace the carpet, and approximately $500 to replace the refrigerator, which had "complete[ly] rust[ed]" because the property was vacant.

The City argues that the trial court properly granted a directed verdict on Schrock's regulatory-taking claim because Schrock provided "no evidence of the

value of the [p]roperty . . . to permit a fact finder to determine the difference in value [of the property] before and after the [purported] taking." However, such an argument unnecessarily limits the considerations that are to be taken into account in determining the economic impact of the regulation on Schrock.

As noted above, relevant to the economic-impact inquiry is the diminution in the value of the property brought on by the City's regulation; lost profits and lost investment suffered by Schrock because of the City's regulation; Schrock's ability, or lack thereof, to continue renting the property because of the City's regulation; and whether the property had a proven, profitable use at the time. *See Sheffield*, 140 S.W.3d at 677; *Navar*, 511 S.W.3d at 631; *Bragg*, 421 S.W.3d at 139; *Wayne*, 266 S.W.3d at 45; *Park*, 230 S.W.3d at 869; *Ronquille*, 463 S.W.3d at 578–79. These are disputed issues of material fact to be answered by the fact finder, i.e., the jury in the instant case, prior to the trial court's ultimate determination of the economic impact of the City's regulation on Schrock. *See City of Dall. v. Millwee-Jackson Joint Venture*, No. 05-13-00278-CV, 2014 WL 1413559, at *7 (Tex. App.—April 4, 2014, pet. denied) (mem. op.) ("Whether the City's action rises to the level of a regulatory taking requires resolution of several disputed facts necessary for application of the legal principles necessary to establish a regulatory taking[] claim."); *Wayne*, 266 S.W.3d at 39, 45–46 (regulatory-taking case with jury trial); *see also City of Lorena v. BMTP Holdings, L.P.*, 409 S.W.3d 634, 645 (Tex. 2013)

31

(evidence raised factual disputes with regard to extent of government's intrusion where property owner, regarding economic impact, asserted property had diminished in value due to government's moratorium); *Schrock*, 2015 WL 8486504, at \*5–6 (recognizing fact issues regarding economic impact of regulation at summary-judgment stage). Notably, although the ultimate determination of whether a government's regulation constitutes a compensable taking is a question of law, "determining whether a [government] regulation is unconstitutional requires the consideration of a number of factual issues" and we must depend on the fact finder "to resolve disputed facts regarding the extent of the governmental intrusion on the property" and the "diminution in [a] property's value." *Mayhew*, 964 S.W.2d at 932–33, 936–37; *Wayne*, 266 S.W.3d at 45–46 (jury must make underlying factual determinations regarding extent of government intrusion and diminution in property's value); *see also Schrock*, 2015 WL 8486504, at \*5.

And as for the City's argument that Schrock cannot testify as to the value of his property or the required expenses, we disagree. *See Redman Homes, Inc. v. Ivy*, 920 S.W.2d 664, 669 (Tex. 1996); *Wayne*, 266 S.W.3d at 49 n.12; *Blanton*, 200 S.W.3d at 274–75 (property owner's testimony concerning value and required expenses relevant to economic-impact inquiry); *see also BMTP Holdings*, 409 S.W.3d at 645 (considering property owner's assessment of diminished value of

32

property due to government's intrusion in considering whether factual dispute raised regarding economic impact on owner).

**B.      Interference with Investment-Backed Expectations**

Under the second factor, the extent to which the regulation interferes with the property owner's distinct investment-backed expectations, "[t]he existing and permitted uses of the property constitute the 'primary expectation' of the [property owner] that is affected by regulation." *Mayhew*, 964 S.W.2d at 936. And the "[h]istorical uses of the property are critically important when determining the *reasonable* investment-backed expectation of the [property owner]." *Id.* at 937 (emphasis added). Existing property regulations at the time a property is purchased and knowledge of those existing regulations should be considered in determining whether a regulation interferes with investment-backed expectations. *Id.* at 936–38. The purpose of the investment-backed expectation requirement is to assess whether the property owner has taken legitimate risks with the reasonable expectation of being able to use the property, which, in fairness and justice, would entitle him to compensation. *Bragg*, 421 S.W.3d at 142.

The trial court admitted into evidence a copy of the City's ordinance in effect when Schrock purchased the property in 1993.[23] *See generally City of Farmers Branch v. Ramos*, 235 S.W.3d 462, 469 (Tex. App.—Dallas 2007, no pet.) (court

---

[23]      *See id.* § 98-65(a), (g), (i) (amended 1991).

may also take judicial notice of City ordinance); *Blackwell v. Harris Cty.*, 909 S.W.2d 135, 140 n.2 (Tex. App.—Houston [14th Dist.] 1995, writ denied). Schrock testified that when he bought the property in 1993, he intended to always use it as a rental property, and at the time of purchase, he had no reason to believe that he would not be able to use the property as a rental property. Further, from 1993 until January 2010, Schrock consistently rented the property, with never more than a one or two week gap in between tenants. In other words, Schrock "always ha[d] another tenant to move in" to the property, and that tenant would pay Schrock a deposit prior to the previous tenant even vacating. Schrock never foresaw a reason that would prevent him from using the property as a rental property.

Schrock also testified that, in general, he had accumulated approximately twenty to thirty rental properties and he originally planned to purchase three houses a year until he reached the age of sixty-five. At that time, he would begin selling the properties and using the money from those sales to support himself. However, once the City stopped providing utility services to the property in January 2010, he essentially stopped buying rental properties, having bought his last two additional properties in 2010. At the time of trial, Schrock had bought only those two houses in the last seven years. In Schrock's opinion, if the City had not tried to make him pay for his tenant's unpaid utility services, then he would have continued with his investment plan.

Regarding the City's ordinance, Schrock explained that on March 31, 2009, the City sent him a letter, stating that, as the owner of the property, he was responsible for "outstanding balances total[ing] . . . $1,999.67" related to unpaid utility services provided by the City to Schrock's tenants from 1993 through 2009. The City, in its letter, essentially wanted Schrock to claim responsibility for the outstanding balances of ten of his previous tenants based on the City's ordinance.[24] According to Schrock, he did not know of the ordinance's requirement of a "Rental Property Declaration" until he received the City's letter. And he had no idea that he could possibly be held responsible for the outstanding balances for utility services owed by his tenants. In fact, his lease agreement with his tenants stated that they were to pay for utility services; Schrock "had nothing to do with it." Schrock had never received a letter from the City, like the March 31, 2009 letter, and he owned approximately thirty-five rental properties by 2009.

The City in its briefing states, as it did in the trial court, that it does not dispute that "Schrock bought the [p]roperty to rent to tenants." However, when considering the second factor, i.e., the extent to which the regulation interferes with Schrock's distinct investment-backed expectations, we are not only concerned with the nature of Schrock's investment-backed expectation, but also with the reasonableness of that expectation. *Mayhew*, 964 S.W.2d at 936–38. And Schrock's knowledge of existing

---

[24] *See id.*

regulations is relevant to the ultimate determination of the extent that the City's ordinance inferred with his investment-backed expectations. *Id.* at 936.

These are disputed issues of material fact to be answered by the fact finder, i.e., the jury in the instant case, prior to the trial court's ultimate determination of the extent to which the City's ordinance interferes with Schrock's distinct investment-backed expectations. *See Millwee-Jackson Joint Venture*, 2014 WL 1413559, at *6–7 (fact finder required to resolve several fact issues including reasonableness of property owner's investment-backed expectation); *see also Mayhew*, 964 S.W.2d at 932–33, 936–37 (although ultimate determination of whether government's regulation constitutes compensable taking constitutes question of law, "determining whether a [government] regulation is unconstitutional requires the consideration of a number of factual issues" and we must depend on fact finder "to resolve disputed facts"); *Schrock*, 2015 WL 8486504, at *5–6 (recognizing, at summary-judgment stage, fact issues regarding extent to which regulation interferes with Schrock's distinct investment-backed expectations).

### C.    Character of Governmental Action

Regarding the third factor, the character of the governmental action, "the nature of the regulation is not as factually dependent as the other two [factors]." *Bragg*, 421 S.W.3d at 144 (internal quotations omitted).  And as stated in our previous opinion, generally, "where courts have found direct governmental actions

in which the governmental defendant had regulatory authority over the matter causing the [property owner's] harm, they have generally found a taking." *Schrock*, 2015 WL 8486504, at \*5 (internal quotations omitted); *see also Hearts Bluff Game Ranch*, 381 S.W.3d at 480. Here, "it is undisputed that the City had direct regulatory authority over the matter causing [Schrock's] harm." *Schrock*, 2015 WL 8486504, at \*5.

However, this is not the only consideration under the third factor. Rather, relevant to the character of the governmental action is evidence that the government acted illegitimately or in bad faith and whether it directed the governmental action in order to injure the property owner, rather than for its purported purpose. *See Hearts Bluff Game Ranch*, 381 S.W.3d at 487–88 (evidence of bad faith "given due weight" as is evidence government "targeted one particular landowner"); *FLCT, Ltd. v. City of Frisco*, 493 S.W.3d 238, 272 (Tex. App.—Fort Worth 2016, pet. denied) (considering whether City intentionally targeted property owner); *Navar*, 511 S.W.3d at 631; *Comunidad Balboa, LLC v. City of Nassau Bay*, 402 S.W.3d 479, 486 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ("Whether the governmental entity acted in bad faith has often been a consideration in determining whether a governmental action gives rise to a compensable taking."); *Blanton*, 200 S.W.3d at 279 (relevant to character of governmental action whether City made decision to take unfair advantage of property owner); *see also Hallco Tex., Inc. v.*

37

*McMullen Cty.*, 221 S.W.3d 50, 77–78 (Tex. 2006) (Hecht, J. dissenting) (noting timing of county's ordinance suggested may have been directed at injuring property owner rather than protecting county and considering whether evidence supported county's assertion ordinance adopted to protect health and safety of residents); *Sheffield*, 140 S.W.3d at 678–79 (evidence City attempted to take unfair advantage of developer when decision to rezone not made until developer closed on purchase of property).

Schrock testified that even though he, prior to May 1, 2009, had never submitted a "Rental Property Declaration," in order to assert that he did not "wish [the property] to be security for the water, sewer and garbage collection service charges for service to th[e] property," the City always knew that the property constituted a rental property based on the amount of a deposit it had received from Schrock's tenants for the initiation of utility services, including water service. Further, every time that the City provided one of Schrock's tenants with utility services, that tenant gave the City a copy of the lease agreement for the property.

Similarly, Troller, assistant city manager for the City, explained that irrespective of whether a property owner ever filed a "Rental Property Declaration," the City was aware whether an individual seeking utility services, including water service, at a given property was a property owner or a tenant and whether a property constituted a rental property because the amount of deposit required for the initiation

38

of utility services depended on whether a given individual was a property owner or a tenant. Further, when asked whether "the City would be on notice at that point[, i.e., at the time a deposit for utility services was paid,] whether or not the property [was a] rental property," Troller stated, "Yes, sir."

Schrock also testified that the City's ordinance, prior to its amendment in 2011 and 2012, conflicted with Texas law,[25] and the State concedes the same. And the record reveals that the City's ordinance, in 2011 and 2012, was amended to create exemptions from the placement of liens for unpaid utility services and to remove the "Rental Property Declaration" requirement entirely.[26] However, according to Schrock, at his April 21, 2009 hearing "to contest the amount due and owing and/or [the] proposed lien" on the property, he was told by the City that "the[] law" stated that "landlords of properties had to pay the water bills from [their] tenants that didn't pay [them]." Yet, Troller, who conducted Schrock's hearing and signed the City's April 24, 2009 letter regarding "the appeal of the imposition of lien for unpaid utility services," testified that that he was not aware that the City's ordinance, prior to its amendment, conflicted with Texas law.

---

[25]  *See* TEX. LOC. GOV'T CODE ANN. § 552.0025.

[26]  *See* Baytown, Tex., Code of Ordinances, ch. 98, art. III, § 98-65(g) (amended 2011 and 2012).

Further, Schrock testified that when he attempted to pay the lien attached to the property on October 19, 2010, the amount of the lien remained unchanged, even though in May 2010, one of his former tenants actually paid a delinquent utilities account with the City. And when Schrock went to make his lien payment in October 2010, the City informed him that he would need to also address his "other 19 accounts" related to the other nineteen rental properties that he owned at the time. In other words, according to Schrock, he was told that he "had to pay everything that had ever been on any of [his] rent houses," which "could have been as much as 19 times" $1,500. Thus, Schrock believed that paying the lien attached to the property would not ultimately resolve his situation with the City.

Based on the foregoing, whether the City acted illegitimately or in bad faith and whether it directed its governmental action in order to injure Schrock, rather than for its purported purpose, are disputed issues of material fact to be answered by the fact finder, i.e., the jury in the instant case, prior to the trial court's ultimate determination of the character of the governmental action. *See Mayhew*, 964 S.W.2d at 932–33, 936–37 (although ultimate determination of whether government's regulation constitutes compensable taking constitutes question of law, "determining whether a [government] regulation is unconstitutional requires the consideration of a number of factual issues" and we must depend on the fact finder "to resolve disputed facts"); *Millwee-Jackson Joint Venture*, 2014 WL 1413559, at *6 (three

40

factors must be evaluated by trial court, as well as any other relevant consideration, to determine whether there has been regulatory taking, but "fact finder will be [the one] required to resolve several fact issues"); *Wayne*, 266 S.W.3d at 45–46 (jury must make underlying factual determinations); *see also Hallco*, 221 S.W.3d at 78 (Hecht, J. dissenting) ("Whether a regulatory taking has occurred is, as we have said, a question of law, but it must be answered after the relevant facts have been determined.").

## D. Other Considerations

Although in determining whether a regulatory taking has resulted from the government's unreasonable interference with a property owner's right to use and enjoy his property, a court may consider the aforementioned three factors and any "surrounding circumstances" or other "relevant circumstances," little light has been cast as to what such relevant circumstances may be. *See Sheffield*, 140 S.W.3d at 672–73 (internal quotations omitted); *see also Day*, 369 S.W.3d at 840; *Bragg*, 421 S.W.3d at 145–46 (noting under "[o]ther [c]onsiderations" that courts may "consider the nature of the [property owner's] business beyond the financial considerations analyzed under the economic[-]impact factor"). Because Schrock has not asserted that there were "material fact issues to be determined by the jury" related to any such other necessary considerations, we do not express an opinion whether any

41

"surrounding circumstances" or other "relevant circumstances" raise additional fact issues. *See* TEX. R. APP. P. 47.1.

## E. Damages

In his second amended petition, Schrock, on his regulatory-taking claim, sought "all actual damages resulting from the [City's] inverse condemnation of his [p]roperty." The City, however, argues that the trial court properly granted a directed verdict on Schrock's regulatory-taking claim because Schrock "provided no evidence of the value of the [p]roperty" on "[a]ny other date after 1993 when Schrock purchased the property," and thus, provided no evidence of damages.

In a condemnation proceeding, the burden to establish the value of the condemned property is on the condemnee. *Religious of Sacred Heart of Tex. v. City of Hous.*, 836 S.W.2d 606, 613 (Tex. 1992); *State v. Moore Outdoor Props., L.P.*, 416 S.W.3d 237, 247 (Tex. App.—El Paso 2013, pet. denied). The term "[m]arket value" means "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying." *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001). Texas recognizes three approaches to determining the market value of a condemned property: the comparable sales approach, the income approach, and the cost approach. *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 871 (Tex. 2009); *Sharboneau*, 48 S.W.3d at 182; *see also City of*

*San Antonio v. El Dorado Amusement Co.*, 195 S.W.3d 238, 247–48 (Tex. App.—San Antonio 2006, pet. denied) (discussing method of calculating damages in regulatory-taking case). The comparable sales method is the favored approach, but when comparable sales figures are not available, courts will accept testimony based on the other two methods. *Cent. Expressway*, 302 S.W.3d at 871. The cost approach looks to the cost of replacing the condemned property minus depreciation. *Id.* The income approach is appropriate when the property would be priced according to the rental income it generates. *Id.* All three methods are designed to approximate the amount a willing buyer would pay a willing seller for the property. *Id.*

Texas law allows income from a business operated on the property to be considered in two situations: (1) when the taking, damaging, or destruction of property causes a material and substantial interference with access to one's property and (2) when only a part of the land has been taken, so that lost profits may demonstrate the effect on the market value of the remaining land and improvements. *Id.*; *Dall. Cty. v. Crestview Corners Car Wash*, 370 S.W.3d 25, 39 (Tex. App.—Dallas 2012, pet. denied).

As previously noted, a property owner is qualified to testify as to the market value of his property. *See Redman Homes*, 920 S.W.2d at 669.

Schrock testified that he purchased the property in 1993 for $21,000. In 2006 or 2007, he spent $5,000 to $5,500 renovating the property, which included

rebuilding the outer walls, installing and painting new siding, and installing new insulation. The trial court admitted into evidence photographs of the property after the renovation, but before any utility services were suspended by the City. Schrock opined that the property would "have held up another 10 or 15 years with the new siding on it."

From 1993 until January 2010, Schrock consistently rented the property, with never more than a one or two week gap in between tenants. According to Schrock, he "always ha[d] another tenant to move in" to the property. Schrock testified that his tenants paid less than $2,000 a month and his last tenant paid $600 a month in rent and a $400 deposit.

In January 2010, Schrock signed a lease agreement with a new tenant, Cuellar. However, when Cuellar, on or about January 20, 2010, sought to have water service to the property "turned on," the City refused to do so unless Schrock paid the cost of the lien that the City had attached to his property as well as interest, a filing fee, and the unpaid "water bill" of one of Schrock's former tenants that accrued after the City had filed its lien. When Schrock could not pay the amount owed on or about January 20, 2010, Cuellar vacated the property immediately because the City would not provide water service to the property. As a result, Schrock refunded Cuellar his $600 rent payment and his $400 deposit, and Schrock reimbursed Cuellar for the deposits that he had made for gas and electricity. At the time that Cuellar vacated the

44

property, Schrock did not have another tenant to rent the property. According to Schrock, the lien placed on the property prevented any new tenant from securing utility services, including water service, for the property, and thus, prevented Schrock from renting the property from January 2010 onward.

Schrock further testified that after the City stopped providing utility services to the property in January 2010, it became difficult to maintain the property without a tenant living there. For instance, rats gained access to the property through "the back of the cabinets," under the stove, and "the heating unit in the hall." The rats also went "up in[to] the ceiling" and ate holes. Additionally, mold grew in various places inside the property, and in 2012, the property was "broken into by kids a couple of times [who] pretty much tore up [the] inside." Those individuals "tore the walls up," tore out the light fixtures and ceiling fans, "busted windows," ripped the doors off of cabinets, "pulled . . . pieces of the flooring up," and vandalized the air-conditioning unit. Further, because the property was vacant for an extended period of time, the City "disconnect[ed] the . . . power wires," "pull[ed] the [electrical] meter out," and removed the gas meter. According to Schrock, the property became uninhabitable.

Schrock also explained that if the City had provided utility services, including water service, to the property, then the property would have been occupied and the

aforementioned damages would not have occurred. In fact, no one had ever broken into any of his other rental properties, which all had tenants.

In order to make the property habitable again, Schrock testified that it would cost $1,100 to have the "power wires" reconnected and the electrical meter replaced. It would also cost $400 to have the gas meter put back in, and approximately $4,922.52 to replace the air-conditioning system. Additionally, because of the rats, mold, and vandalism at the property, it would cost $8,500 to repair the drywall, approximately $2,000 to replace the carpet, and approximately $500 to replace the refrigerator, which had "complete[ly] rust[ed]" because the property was vacant.

Based on the foregoing, we conclude that there is evidence that raises a material fact issue related to Schrock's damages.

\* \* \*

As previously noted, in reviewing a case in which a verdict has been directed, we must view the evidence in the light most favorable to the party against whom the verdict was rendered and disregard all contrary evidence and inferences. *Del Lago Partners*, 307 S.W.3d at 770; *Qantel Bus. Sys., Inc. v. Custom Controls Co.*, 761 S.W.2d 302, 303–04 (Tex. 1988). If we conclude there is any evidence of probative value which raises a material fact issue, then we must reverse the judgment and remand the case to allow the jury to determine the issue. *Qantel Bus. Sys.*, 761 S.W.3d at 303–04; *Harris Cty. v. Walsweer*, 930 S.W.2d 659, 664 (Tex. App.—

Houston [1st Dist.] 1996, writ denied); *see also Wright v. Gen. Motors Corp.*, 717 S.W.2d 153, 155 (Tex. App.—Houston [1st Dist.] 1986, no writ) ("If an issue of fact is raised by the evidence, the case must go to the jury even [if] the court might set aside the verdict on the ground that it was not supported by sufficient evidence.").

Considering the evidence in the light most favorable to Schrock, we conclude, as noted above, that there is at least some evidence of probative force to raise several material fact issues related to Schrock's regulatory-taking claim. Accordingly, we hold that the trial court erred in granting the City a directed verdict on Schrock's regulatory-taking claim.

We sustain Schrock's first issue.

## Declaratory-Judgment Claim

In his second issue, Schrock argues that the trial court erred in granting a directed verdict that Schrock take nothing on his declaratory-judgment claim because it does not merely restate his regulatory-taking claim, he challenges the validity of certain sections of the City's ordinance, the City's release of its lien on the property did not resolve the issue of the lien's validity, and Schrock seeks clarification of his rights under the current version of the City's ordinance.

In his second amended petition, related to his declaratory-judgment claim, Schrock sought a declaration that the City's enforcement of its ordinance,[27] prior to

---

[27] *See id.* § 98-65(g), (i) (amended 1991).

its amendment, against him in 2010 "resulted in the inverse condemnation of [his] property for which no just compensation [was] paid"; a declaration that certain sections of the City's ordinance,[28] prior to its amendment, were "invalid, illegal, and/or unconstitutional" and conflicted with the Local Government Code;[29] a "clarification as to the validity of [the City's] utility lien"; and a "clarification as to his rights under the current version" of the City's ordinance[30] and as to whether the City "c[ould] lawfully prevent [his] tenants from obtaining utility service[s] at the [p]roperty."

After Schrock rested his case, the City orally moved for a directed verdict, arguing that there were no disputed issues of material fact related to Schrock's regulatory-taking claim; the question of whether there was a regulatory taking was a question of law; the City's action did not constitute a taking as a matter of law; and there was no evidence that the City was responsible for Schrock's damages because "a substantial amount of the damages . . . related to vandalism of the property" were unrelated to the purported regulatory taking. While it is clear from the record that the City orally moved for a directed verdict on Schrock's regulatory-taking claim, it does not appear that the City argued that it was entitled to a directed verdict on

---

[28]   *See id.*

[29]   *See* TEX. LOC. GOV'T CODE ANN. § 552.0025.

[30]   *See* Baytown, Tex., Code of Ordinances, ch. 98, art. III, § 98-65(g) (amended 2011 and 2012).

Schrock's declaratory-judgment claim. Nevertheless, following the City's motion, the trial court entered a directed verdict in favor of the City, holding that Schrock take nothing on his regulatory-taking claim *and* his declaratory-judgment claim. Under such circumstances, we treat the trial court's directed verdict on Schrock's declaratory-judgment claim as a sua sponte directed verdict. *See Harvey v. Elder*, 191 S.W.2d 686, 687 (Tex. App.—San Antonio 1945, writ ref'd); *Allen v. State Farm Lloyds*, No. 05-16-00108-CV, 2017 WL 3275912, at *14 (Tex. App.—Dallas Aug. 1, 2017, pet. denied) (mem. op.) (where directed-verdict motion specifies claim and trial court dismisses all claims, "[w]e treat this as a sua sponte directed verdict"); *Johnson v. Whitehurst*, 652 S.W.2d 441, 446 (Tex. App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.) ("It has long been Texas law that a trial court may render a directed verdict on its own motion where there are no disputed issues of fact.").

Governmental immunity protects political subdivisions of the State, including cities. *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 694 n.3 (Tex. 2003). Governmental immunity, composed of both immunity from liability and immunity from suit, implicates a trial court's jurisdiction, and when it applies, precludes suit against a governmental entity. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004); *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002); *City of Wimberley Bd. of Adjustment v. Creekhaven, LLC*, No. 03-18-00169-CV, 2018 WL 5074580, at *3 (Tex. App.—Austin Oct. 18,

49

2018, no pet.) (mem. op.). Absent an express waiver of governmental immunity, courts do not have subject-matter jurisdiction over suits against political subdivisions of the State. *State v. Shumake*, 199 S.W.3d 279, 283 (Tex. 2006); *Creekhaven*, 2018 WL 5074580, at \*3.

The Declaratory Judgment Act ("DJA") gives Texas courts the power to "declare rights, status, and other legal relations whether or not further relief is or could be claimed." TEX. CIV. PRAC. & REM. CODE ANN. § 37.003(a). It provides that a person "whose rights, status, or other legal relations are affected" by a statute or an ordinance "may have determined any question of construction or validity arising under" the statute or ordinance and "obtain a declaration of rights, status, or other legal relations thereunder." *See id.* § 37.004(a). The DJA waives governmental immunity in a suit that involves the validity of a city's ordinance. *City of Dall. v. Albert*, 354 S.W.3d 368, 378 (Tex. 2011); *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 n.6 (Tex. 2009) ("For claims challenging the validity of ordinances or statutes, however, the [DJA] requires that the relevant governmental entities be made parties, and thereby waives immunity.").

A declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties and the controversy will be resolved by the declaration sought. *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995). There must be a real and substantial controversy involving a genuine conflict of

tangible interests and not merely a theoretical dispute. *City of Dall. v. VSC, LLC*, 347 S.W.3d 231, 240 (Tex. 2011); *Bonham State Bank*, 907 S.W.2d at 467. The DJA gives a court no power to decide hypothetical or contingent situations or to determine questions not essential to the decision of an actual controversy, even if such questions may in the future require adjudication. *City of Richardson v. Gordon*, 316 S.W.3d 758, 761 (Tex. App.—Dallas 2010, no pet.); *Robinson v. Alief Indep. Sch. Dist.*, 298 S.W.3d 321, 324–25 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

A case becomes moot if, since the time of its filing, a controversy ceases to exist because the issues are no longer "live" or the parties lack a legally cognizable interest in the outcome. *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 162 (Tex. 2012) (internal quotations omitted). Courts may not decide moot controversies because the Texas Constitution prohibits advisory opinions on abstract questions of law. *See Klein v. Hernandez*, 315 S.W.3d 1, 3 (Tex. 2010).

In his second amended petition, Schrock first sought a declaration that the City's enforcement of its ordinance,[31] prior to its amendment, against him in 2010 "resulted in the inverse condemnation of [his] property for which no just compensation [was] paid." However, the DJA is "not available to settle disputes already pending before a court." *BHP Petroleum Co. v. Millard*, 800 S.W.2d 838,

---

[31] *See id.* § 98-65(g), (i) (amended 1991).

841 (Tex. 1990) (internal quotations omitted). And a trial court lacks jurisdiction over a declaratory-judgment claim that merely restates a plaintiff's claim for a taking. *Ronquille*, 463 S.W.3d at 583 ("Because [plaintiff's] Declaratory Judgment Act claim merely restates her takings claim, we hold that the trial court lacks jurisdiction over her request for declaratory judgment."); *City of Anson v. Harper*, 216 S.W.3d 384, 395 (Tex. App.—Eastland 2006, no pet.); *see also City of Hous. v. Williams*, 216 S.W.3d 827, 829 (Tex. 2007) ("[I]n every suit against a governmental entity for money damages, a court must first determine the parties' contract or statutory rights; if the sole purpose of such a declaration is to obtain a money judgment, immunity is not waived [by the DJA]."). Thus, we conclude that the trial court lacked jurisdiction over this portion of Schrock's declaratory-judgment claim.

Schrock next sought a declaration that certain sections of the City's ordinance,[32] prior to its amendment, were "invalid, illegal, and/or unconstitutional" and conflicted with the Local Government Code.[33] However, any declaratory relief sought regarding the validity of a city's ordinance is rendered moot by the amendment of the ordinance's challenged provisions. *See Speer v. Presbyterian Children's Home & Serv. Agency*, 847 S.W.2d 227, 228–30 (Tex. 1993) (claim of discriminatory practices in hiring adoption service workers that sought only

---

[32]     *See id.*

[33]     *See* TEX. LOC. GOV'T CODE ANN. § 552.0025.

52

declaratory and injunctive relief became moot when entity stopped offering adoption services); *Gordon*, 316 S.W.3d at 762 (claim for declaratory-judgment moot where "city charter provision about which [plaintiff] complain[ed] . . . [was] amended" so that no future violations of that provision c[ould] occur"); *Trulock v. City of Duncanville*, 277 S.W.3d 920, 925–28 (Tex. App.—Dallas 2009, no pet.) (claim city ordinance unconstitutional rendered moot when City modified ordinance to delete challenged provisions). Here, it is undisputed that the City's ordinance at issue in this case was amended in 2011 and 2012 and the specific sections of the City's ordinance about which Schrock seeks a declaration, in this portion of his declaratory-judgment claim, have either been amended or removed entirely. *See* Baytown, Tex., Code of Ordinances, ch. 98, art. III, § 98 65(g), (i) (amended 2011 and 2012) (amending subsection (g), removing previous subsection (i), and no longer requiring "Rental Property Declaration"). Thus, we conclude that Schrock's request for a declaration that certain pre-amendment sections of the City's ordinance were "invalid, illegal, and/or unconstitutional" and conflicted with the Local Government Code is moot.

Regarding Schrock's request for a "clarification as to the validity of [the City's] utility lien," it is undisputed, and the evidence shows, that on June 13, 2013, the City released the lien attached to the property, and that release was filed in the Harris County real property records. Schrock, however, asserts that the City's

53

release of the lien does not render this portion of his declaratory-judgment claim moot because "the City has never confirmed that [he] is not liable for his tenants' water bills."

The trial court admitted into evidence a copy of the City's release of the lien that was previously attached to the property, and a copy of a June 18, 2013 letter that the City sent to Schrock regarding the release of its lien. That letter states: "Please find enclosed 'Release of Utility Lien' for the above referenced property. *The lien is paid in full . . . .*" (Emphasis added.) Further, the City's ordinance, as amended in 2011 and 2012, provides:

**Sec. 98-65. Liens.**

(a)     *Water*.  Liens for unpaid water charges shall be filed according to the following:

(1)     After the [C]ity has terminated a customer's water pursuant to subsection 98-62(i) or after the [C]ity terminates water service at the customer's request, the supervisor of the utility billing division shall file a lien on the property served by the terminated water service and in the amount the customer whose service was terminated owed to the [C]ity for water service at the time of the termination of services.

. . . .

(d)     *Exemptions*.  No lien for water charges, garbage collection charges, or sewer charges shall be placed on a property if:

(1)     A customer owes less than $50.00 for the aggregate sum of water charges, garbage collection charges, and sewer charges;

(2)     The customer is not delinquent in payment for water charges, garbage collection charges, or sewer charges;

54

. . .

>(4)     *The [C]ity knows the property to be a single-family dwelling house and the delinquent water charges, garbage collection charges, or sewer charges to be for services provided to a residential consumer who is not the owner of the property.*

>(g)     *Reconnection of services.* No water, garbage or sewer services shall be provided to property encumbered by a lien filed pursuant to this section, *except as otherwise required by V.T.C.A., Local Government Code § 552.0025. . . .*

*See* Baytown, Tex., Code of Ordinances, ch. 98, art. III, § 98-65(a), (d), (g) (amended 2011 and 2012) (emphasis added) (amending subsections (d) and (g), repealing former subsection (i), entitled "Rental property," renumbering former subsection (j), entitled "Effect of section," as subsection (i), and no longer requiring "Rental Property Declaration").

Under the amended ordinance, the City may not place a lien on a property if the City knows that the property is a single-family dwelling and the delinquent utility charges associated with the property are for services provided to a residential customer who is not the property's owner, like a tenant. We conclude that Schrock's request for a clarification as to the validity of the lien previously attached to the property, but now removed, is moot. *See Wright v. Hooker*, No. 12-17-00095-CV, 2017 WL 6350137, at *9 (Tex. App.—Tyler Dec. 13, 2017, no pet.) (mem. op.) ("Here, EMS released the lien on [plaintiff's] claims prior to the filing of this actions; thus, her claim for declaratory relief that EMS filed the lien in violation of Chapter

55 was moot prior to its filing . . . ."); *Englobal U.S., Inc. v. Jefferson Refinery, L.L.C.*, No. 09-14-00210-CV, 2015 WL 8476545, at *2 (Tex. App.—Beaumont Dec. 10, 2015, no pet.) (mem. op.) (in declaratory-judgment action part of dispute regarding validity of lien became moot after lien released); *Target Corp. v. Advanced Alarm Sys., Inc.*, No. 09-06-322-CV, 2007 WL 1628101, at *1–2 (Tex. App.—Beaumont June 7, 2007, no pet.) (mem. op.) (removal of lien by settlement rendered moot issue of lien's validity); *cf. Schrock*, 2015 WL 8486504, at *9 (holding summary-judgment burden not met related to Schrock's declaratory-judgment claim regarding validity of lien where copy of lien release not contained in record and no evidence lien release filed in county's real property records); *Jackson v. City of McKinney*, No. 05-00-00062-CV, 2001 WL 946811, at *4 (Tex. App.—Dallas Aug. 22, 2001, no pet.) (mem. op.) (release of lien did not render claim moot because absent declaratory judgment City could reassert liens).

Finally, Schrock sought a "clarification as to his rights under the current version" of the City's ordinance[34] and as to whether the City "c[ould] lawfully prevent [his] tenants from obtaining utility service[s] at the [p]roperty." Although the DJA waives immunity for certain claims, it is not a general waiver of governmental immunity. *Tex. Parks & Wildlife Dep't v. Sawyer Trust*, 354 S.W.3d

---

[34] *See* Baytown, Tex., Code of Ordinances, ch. 98, art. III, § 98-65(g) (amended 2011 and 2012).

384, 388 (Tex. 2011); *Heinrich*, 284 S.W.3d at 370. Rather, the DJA provides a limited waiver of immunity for claims challenging the validity or constitutionality of a statute or ordinance. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.006(b); *Heinrich*, 284 S.W.3d at 373 n.6; *Tex. Dep't of Ins. v. Green*, No. 01-15-00321-CV, 2016 WL 2745063, at *3 (Tex. App.—Houston [1st Dist.] May 10, 2016, pet. denied) (mem. op.); *see also Harvel v. Tex. Dep't of Ins.–Div. of Workers' Comp.*, 511 S.W.3d 248, 253 (Tex. App.—Corpus Christi 2015, pet. denied) (DJA's waiver of governmental immunity is "narrow"). Notably, the DJA does not waive governmental immunity when a plaintiff seeks a declaration of his rights under a statute, ordinance, or other law. *Tex. Dep't of Trans. v. Sefzik*, 355 S.W.3d 618, 621 (Tex. 2011). Schrock's request for a "clarification as to his rights under the current version" of the City's ordinance and as to whether the City "c[ould] lawfully prevent [his] tenants from obtaining utility service[s] at the [p]roperty," does not constitute a request for a declaration concerning the validity of the City's ordinance such that the City's immunity is waived. *See Creekhaven*, 2018 WL 5074580, at *4. Thus, we conclude that the trial court lacked subject-matter jurisdiction over this portion of Schrock's declaratory-judgment claim.

Based on the foregoing, we hold that the trial court did not err in granting the City a directed verdict on Schrock's declaratory-judgment claim.

We overrule Schrock's second issue.

57

In his second amended petition, Schrock sought attorney's fees pursuant to the DJA. In a portion of his second issue, Schrock asserts that "[b]ecause the trial court dismissed Schrock's declaratory[-]judgment claim in error, [he] is entitled to attorney's fees pursuant to the [DJA]." Because we have held that the trial court did not err in granting the City a directed verdict on Schrock's declaratory-judgment claim and Schrock does not assert that the trial court erred in failing to award him attorney's fees, irrespective of whether or not he prevailed on his declaratory-judgment claim, we need not address this portion of Schrock's second issue. *See* TEX. R. APP. P. 38.1, 47.1; *Washington v. Bank of N.Y.*, 362 S.W.3d 853, 854–55 (Tex. App.—Dallas 2012, no pet.) (party who does not adequately brief a complaint on appeal waives his issue); *see also Indian Beach Prop. Owners' Ass'n v. Linden*, 222 S.W.3d 682, 706 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (party need not prevail to be awarded attorney's fees under DJA).

## Conclusion

We reverse the portion of the trial court's judgment granting the City a directed verdict on Schrock's regulatory-taking claim against it, and we remand a portion of the case to the trial court for a new trial on Schrock's regulatory-taking claim. We affirm the remaining portion of the trial court's judgment.


Julie Countiss
Justice

Panel consists of Chief Justice Radack and Justices Goodman and Countiss.